State *ex rel.* Knox, Attorney-General, *v.* Speakes *et al.**

(In Banc.   June 21, 1926.)

[109 So. 129.   No. 25852.]

1. STATUTES. *Statute creating county courts in certain counties held not local or special law, when interpreted as authorizing Governor to determine population of counties automatically coming under act (Laws 1926, chapter 131; Constitution 1890, section 90).*

   Laws 1926, chapter 131, creating and establishing county courts in certain counties, *held* not a local or special law, in violation of Constitution 1890, section 90, when interpreted as providing that population of counties automatically coming under act is to be ascertained by Governor after 1926, and not to be determined by federal census of 1920.

2. STATUTES.

   Meaning of provision, which is not ascertainable from act itself, cannot be enforced by the courts.

3. STATUTES.

   In determining whether act is general or local or special law, courts will look to substance and practical operation of law, rather than to its form and phraseology.

4. STATUTES.

   A law is "general" when it applies to and operates uniformly on all members of any class of persons, places, or things requiring legislation peculiar to particular class dealt with by law.

5. STATUTES.

   Law is "general and uniform" if it operates on every person who is brought within classification and circumstances provided for, though not operating on every person in state.

6. CONSTITUTIONAL LAW.

   If Constitution is silent on subject of legislation, the legislature, is supreme, but, where Constitution speaks, legislature may only go to extent permitted by Constitution.

7. CONSTITUTIONAL LAW.

   Laws 1926, chapter 131, enacted under authority of Constitution, 1890, section 172, creating county courts in certain counties, *held* not violative of sections 146, 156, 159, 171, conferring jurisdiction on different courts.

8. CONSTITUTIONAL LAW. Statutes. Provision in county court law, conferring authority on circuit judges to try appeals in vacation without notice held in violation of Constitution, but, being separable, does not affect validity of statute (Laws 1926, chapter 131; Constitution 1890, section 14).

Provision of Laws 1926, chapter 131, creating county courts, which conferred on circuit judges authority to try appeals in vacation without notice, held in violation of Constitution 1890, section 14, but, being separable from balance of act, does not go to constitutionality so as to affect validity of statute.

McGOWEN, J., and SMITH, C. J., dissenting.

*Corpus Juris-Cyc. References: Constitutional Law, 12CJ, p. 746, n. 5; p. 816, n. 93; p. 1239, n. 86 New; Statutes, 36 Cyc, p. 969, n. 90; p. 983, n. 63; p. 985, n. 69; p. 988, n. 75; p. 992, n. 91; p. 993, n. 93; p. 1004, n. 32; p. 1012, n. 54; Test as to character of law, see 25 R. C. L., p. 815; 4 R. C. L. Supp., p. 1603; 5 R. C. L. Supp., p. 1347; When law general in constitutional sense, see 25 R. C. L., p. 816; 4 R. C. L., p. 1603; 5 R. C. L. Supp., p. 1347.

APPEAL from circuit court of Bolivar county, First district.

HON. W. A. ALCORN, JR., Judge.

Mandamus by the state, on the relation of Rush H. Knox, attorney-general, against W. A. Speakes and others, to require respondents as members of the board of supervisors of Bolivar county, to submit to qualified electors question of whether County Court Act should be put in force. Judgment dismissing the petition, and plaintiff appeals. Reversed and remanded.

Rush H. Knox, Attorney-General, A. B. Sparkman, Simmons & Jackson, Harry M. Bryan, Assistant Attorney-General, for appellant, and P. C. Canizaro and R. J. Bishop, amicus curiae.

I. While the Constitution of the United States is a grant of power, the Constitution of the state of Mississippi operates only as a limitation upon the power of the people; and the legislature as the representative of the people has the inherent power to enact any law not

expressly or impliedly prohibited by the Constitution of
the state. Section 32, Constitution of Mississippi; section
33, Constitution of 1890; *State v. Board of Supervisors,*
105 So. 541; *Hinton v. Board of Supervisors,* 36 So. 565,
84 Miss. 536; *Hart v. State,* 87 Miss. 171, 39 So. 523;
*State ex rel. Greaves, Dist. Atty., v. Henry,* 87 Miss. 125,
40 So. 152; *State ex rel. District Attorney, v. Edwards,*
93 Miss. 704, 46 So. 964; *Johnston v. Reeves & Company,*
112 Miss. 227, 72 So. 925.

The above cases are also cited as examples of an un-
broken line of authorities which hold that it is the duty
of the court to decide in favor of the constitutionality of
any act of the legislature unless the act plainly conflicts
with the fundamental law and in this respect conflicts
will not be presumed. See *State v. L. & N. R. R. Co.,* 97
Miss. 35, 53 So. 454; and *Natchez R. R. Co. v. Crawford,*
99 Miss. 697, 55 So. 596.

Applying the above principle to the case at bar, we
find nothing in the Constitution of this state prohibiting
the legislature from creating an inferior court and con-
ferring upon it such jurisdiction as they may see fit; but,
on the other hand, we find the power to create such in-
ferior courts as may be deemed necessary clearly ex-
pressed in section 172, Constitution of 1890, which pro-
vides: "The legislature shall from time to time estab-
lish such inferior courts as may be necessary and abolish
the same whenever deemed expedient."

What is meant by the term "inferior court?" In study-
ing this question from the standpoint of our own ju-
dicial history, we find that the Constitution of 1832 and
the Constitutions of 1869 and 1890 all contain similar
provisions with reference to the organization of the judi-
cial branch of our government. In the Constitution of
1832 the court of last resort was designated as a "high
court of errors and appeals," and in the Constitutions
of 1869 and 1890, it was designated as a "supreme court."
All of these Constitutions created circuit courts, chan-
cery courts, and courts of justices of the peace, and con-

ferred upon these courts all original jurisdiction covering the entire judicial power of the state. In each of these Constitutions there is found in practically the same language the provision of section 172, Constitution of 1890, quoted above. In addition to the courts mentioned above, the Constitution of 1832 provided for a probate court.

Under the Constitution of 1832 the legislature, at its 1836 session, passed an act creating a criminal court for certain counties of the state, and the legislature, at its 1842 session, passed an act creating an inferior chancery court. The constitutionality of each of these courts was passed upon by the High Court of Errors and Appeals, the criminal court under the Act of 1836 being passed upon in *Thomas* v. *State,* 5 How. 20, and the inferior chancery court under the Act of 1842 being passed upon in *Houston* v. *Royston,* 7 How. 543.

These two cases hold that all courts other than the supreme court are inferior courts, that any court which is subject to the appellate jurisdiction of another court is an inferior court, and that any court of a limited jurisdiction is an inferior court.

In the adoption of the subsequent Constitutions, the section with reference to inferior courts was inserted therein with the meaning given to it by these decisions. *Shotwell* v. *Covington,* 69 Miss. 735; *Weathersby* v. *Roots,* 72 Miss. 355; *Pattison* v. *Clingan,* 47 So. 503, 93 Miss. 310; *Hinton* v. *Board of Supervisors,* 36 So. 564; *Burks* v. *Moody,* 107 So. 279. See also *Rabe* v. *Fyler,* 10 S. & M. 440, where the question of an unlawful entry and detainer court was involved; *Pegram* v. *West Hatchie & Owl Creek Drainage District,* 108 Miss. 793, 67 So. 453, where the constitutionality of a statute creating an inferior court was questioned. On the question of what an inferior court is, see, also: *Swift* v. *Wayne Circuit Judges,* 64 Mich. 749, 31 N. W. 434; *Baily* v. *Winn et al.,* 113 Mo. 155, 20 S. W. 21; *Kirkwood* v. *Washington County,* 52 Pac. 568; *Ex parte Lothrop,* 6 Sup. Ct. 984, 118 U. S. 113, 30 L. Ed. 108.

The county court created by the legislature of 1926 is an inferior court within the meaning of the Constitution, especially as the jurisdiction of the county court is limited to matters in which the amount in controversy does not exceed one thousand dollars exclusive of interest and cost, the county court, therefore, being limited as to the extent of its jurisdiction and subject to the appellate jurisdiction of a higher court.

II.   The demurrer filed in this cause alleges that chapter 131, Laws of 1926, creating the county court system is violative, among others, of the following sections of the Constitution: Sections 156, 157, 159, 160, 162 and 171. All of these sections of the Constitution relate to the creation and jurisdiction of the chancery, circuit and justice courts.

It will be seen that the entire original judicial power is conferred upon these three courts—the circuit, chancery and justice courts; that no judicial power is left undisposed of; but that the entire original judicial power of the state is conferred upon one or the other of these three courts.   However, section 172, Constitution of Mississippi provides: "The legislature shall from time to time establish such other inferior courts as may be necessary and abolish the same whenever deemed expedient."

This necessarily implies the power on the part of the legislature to confer upon such inferior courts so established some of the jurisdiction given to the circuit, chancery and justice courts, for there is no other jurisdiction to be exercised by any court; and unless the jurisdiction of the circuit, chancery and justice courts is to be invaded, it would be an absurdity to create any other inferior court because there would be no duty or jurisdiction conferred upon it.

Does the provision in section 156, Constitution of Mississippi, that the circuit court shall have original jurisdiction in all matters civil and criminal, etc.; and the pro-

144 Miss.—9.

vision in section 159 that the chancery court shall have
full jurisdiction, etc., and the provision in section 171
that the jurisdiction of the justice of the peace shall ex-
tend to causes in which the principal amount in contro-
versy shall not exceed the sum of two hundred dollars,
confer upon these courts such an exclusive jurisdiction
that an inferior court created under section 172 may not
be given a jurisdiction to any extent which will be con-
current with the circuit, chancery and justice courts?
This question has been negatived in this state in the
cases cited heretofore; to-wit: *Thomas* v. *State,* 5 How.
20; *Houston* v. *Royston,* 7 How. 20; and *Hughes* v. *State,*
79 Miss. 77, 29 So. 786. The first two of these cases seem
to settle the question by holding that it is competent for
the legislature to create an inferior court and vest it
with a jurisdiction concurrent with the circuit, chancery
or justice courts.

Also a court established under section 172, Constitu-
tion of Mississippi, is as much authorized by the Con-
stitution as any other court designated therein by name.
See 7 R. C. L., sec. 7.

While the legislature may confer upon an inferior
court a jurisdiction concurrent with that of the courts
designated in the Constitution, yet the legislature has
not the power to divest any of the courts designated by
the Constitution of any of the power conferred on said
courts therein. *State ex rel. Salter* v. *Board of Super-
visors,* 111 Miss. 867, 72 So. 700. This case holds no
more than it says; namely, that the legislature is with-
out power to withdraw jurisdiction conferred by the
Constitution and is not in conflict with those cases which
hold that an inferior court may be vested with a con-
current jurisdiction.

Other sections of the Constitution alleged by the de-
murrer to be violated by the act of the legislature cre-
ating the county courts are sections 157 and 162, Con-
stitution of 1890. These sections merely provide that
in the event a suit should be filed either in the circuit or

chancery court of which the other court might have exclusive jurisdiction, then the cause should be transferred, but not otherwise; and these sections of the Constitution will continue to be operative notwithstanding the creation and establishment of the county court.

Sections 147, 157 and 162, were not included in the Constitution of 1832 and under that Constitution many decisions held that there was a complete separation of law and equity jurisdiction; but Judge CAMPBELL in *Goyer Cold Storage Co.* v. *Wildberger,* 71 Miss. 438, 15 So. 235, holds that there is a complete blending of law and equity jurisdiction under the Constitution of 1890 by reason of section 147 thereof.

The county court is given not only law but also equity jurisdiction. The case of *Thomas* v. *State,* 5 How. 20, holds that an inferior court may be given concurrent jurisdiction with the circuit court. *Houston* v. *Royston,* 7 How. 543, holds that an inferior court may be created and given jurisdiction concurrent with the chancery court; and *Hughes* v. *State,* 29 So. 786, holds that an inferior court may be created and given jurisdiction concurrent with the justice of the peace court. The only question here is whether or not an inferior court may be created and given concurrent jurisdiction with all three courts in certain particulars. Judge CAMPBELL said "yes" in *Goyer Cold Storage Co.* v. *Wildberger et al., supra,* in holding that there is a complete blending of law and equity jurisdiction under section 147, Constitution of 1890.

However, it will be observed in section 2 of the act creating the county court that the procedure in equity matters is preserved in the county court and made the same as heretofore existing in the chancery court; and that the procedure in civil and criminal matters heretofore exercised by the justice and circuit courts shall be the same as in these courts. The distinction, therefore, between law and equity is carefully preserved in the county court law.

Moreover, it cannot be said that conferring the juris-
diction upon a court of law of matters formerly within
the jurisdiction of the equity court alone operates to de-
prive the equity courts of jurisdiction, for they will con-
tinue to exercise their jurisdiction as theretofore. See
10 R. C. L., pp. 270 and 280, Equity: secs. 15 and 23;
*Mitchell* v. *Otey,* 23 Miss. 236.; *Abbey* v. *Commercial Bank,*
31 Miss. 434; *Phillips* v. *Hines,* 33 Miss. 163; *Farish* v.
State, 4 How. 170.

It will be seen from the foregoing that the equity juris-
diction of the chancery courts has been constantly en-
croached upon by courts of law, either by the courts of
law adopting jurisdiction over matters formerly of equity
jurisdiction, or by statutes giving to courts of law juris-
diction over matters formerly cognizable only in courts
of equity, and that this does not operate to divest the
equity court of that full jurisdiction granted by the
Constitution.

The provision making the county court a court of ap-
peals as to matters originating in the justice courts and
municipal courts does not take the county court out of
that class of courts which are considered as inferior
courts, because the appeals over which it will have juris-
diction are in matters limited to sums not exceeding two
hundred dollars and the judgments of the county court
in such cases are in turn subject to the appellate juris-
diction of the circuit court, and then the supreme court.

It is decided by the United States Supreme Court in
*Martin* v. *Hunter's Lessee,* 1 Wheat. 303 at 337, that the
power to create an inferior court implies the power to
confer upon it not only original jurisdiction, but appel-
late jurisdiction.

Section 171, Constitution of 1890 provides: ''In all
cases tried by a justice of the peace the right of appeal
shall be secured under such rules and regulations as shall
be prescribed by law.'' Also, appeals from municipal
courts are governed by rules and regulations prescribed
by law, and no complaint can be made because the act

creating the county court prescribes the rules and regulations governing appeals from the justice courts and the municipal courts.

This provision of the County Court Law is expressly authorized by the Constitution and is within the inherent power of the legislature as the representative of the people. The act creating the county court provides that all appeals from the county court shall lie to the circuit court. This, of course, includes appeals in equity matters originating in the county court.

The question of an appeal is always to be regulated by law. The fact that appeals in equity matters do not lie to the chancery court does not make the act creating the county court violative of the Constitution because the Constitution does not confer upon the chancery court any appellate jurisdiction whatever; but, on the other hand, the Constitution does confer upon the circuit court, in section 156 thereof, "such appellate jurisdiction as may be prescribed by law."

It is submitted, therefore, that the demurrer, so far as it relates to sections 156, 157, 159, 160, 166 and 171 of the Constitution of this state is not well taken, and should have been overruled.

III.   Consider now sections 87, 90 and 91 of the Constitution of 1890 as grounds for the sustaining of the demurrer. The first question which we will discuss will be: Is this act a local, private or special law or a general law?

The general rule for determining whether or not a law is a local or private law or a general law is well stated in 25 R. C. L., p. 815, section 66, quoted by this court with approval in *Toombs* v. *Sharkey et al.*, 106 So. 273.

Applying this rule to the act in question, we find that the classification used in section 1 is "seventeen million dollars of assessed value of real and personal property," "a permanent population of exceeding thirty-five thousand inhabitants" and "in either event, having a mu-

nicipality therein of five thousand or more inhabitants as shown by the federal census of 1920.''

As we know, this law has gone into effect in ten counties of the state at widely separated places. The objection raised to this classification in the lower court was as to the classification ''in either event, having a municipality therein of five thousand or more inhabitants as shown by the federal census of 1920.''

As to this classification, it would seem to be germane to the amount of business in the courts of such a county, especially criminal courts, as crime is bred largely in places of congested population. It is also reasonable to conclude that there would be more civil and equity matters arising in crowded centers of population where there would be so many different kinds of businesses and where people from the remote rural districts are wont to go to transact a large amount of their business. *Toombs* v. *Sharkey et al., supra.*

The purpose of the act was to establish a court system in the various counties of the state to take care of the needs of those counties in which the dockets of the courts now existing are so crowded with cases that trials are delayed and continued from term to term on account of the large amount of litigation arising in those counties. Those being the larger counties in point of population and assessed valuation of property and with crowded centers of population, it would certainly be a reasonable classification and germane to the subject to make population, wealth and crowded centers of population the basis for the establishment of the county courts in the state.

Furthermore, section 6 of the act clearly shows that it was the intention of the legislature to make this act a general law of the state and that all, or any number, of the other counties of the state in which the court was not established by section 1 of this act might come in under the provisions of the act by a special election as provided in section 6 and have a county court established in

such county. Cases differentiating local and general laws include: *Halsell* v. *Merchants Union Ins. Co.,* 105 Miss. 268; *Drainage District* v. *Buckner,* 108 Miss. 427; *Cox* v. *Wallace,* 100 Miss. 525, 56 So. 461; *Toombs* v. *Sharkey et al.,* 106 So. 273.

From these decisions the rule in Mississippi is that a classification is valid which is germane to the object of the law and which includes within the law all objects, things, places or persons within that class.

Next, it could not be seriously contended that the fact that the operation of the present law in some of the counties of the state is made to depend upon a future contingency; to-wit, the holding of an election, could in any way change the law from a general law to a special law or local law. It is well settled in this state that the legislature may enact a law to become operative upon the happening of a future event. *Lum* v. *City of Vicksburg,* 72 Miss. 950; *Railroad* v. *Edwards,* 78 Miss. 950; *Election Commissioners of Rankin County* v. *Davis,* 102 Miss. 497.

If a classification is germane to the object of the law, it is not a question for the court as to whether it is the best classification that could have been made or not; but whether the classification is made in good faith. 1 Sutherland State Constr., 203.

It is next insisted that the law is a local or private law because of the fact that Section 6 of the law does not fix a salary for the judges of the county court in counties having an assessed valuation of over seventeen million dollars. Under the pleading in this cause Bolivar county has an assessed valuation of over seventeen million dollars and does not come within that class of counties set forth in section 1 of the act as having a municipality within its borders of five thousand or more population as shown by the federal census of 1920. In other words, it is alleged that this act does fail to make provision for salaries in counties having an assessed valuation of over seventeen million dollars; but see rule for

the construction of statutes in Mississippi as set forth in *Adams* v. *R. R. Co.*, 75 Miss. 275 at 283; also, 25 R. C. L., p. 978, sec. 228; *The Paquette Habana*, 175 U. S. 677, 20 Sup. Ct. 290, 44 U. S. (1 Ed.) 320; *McPherson* v. *State*, 174 Ind. 60, 90 N. E. 610, 31 L. R. A. (N. S.) 188; *Luria* v. *U. S.*, 231 U. S. 9, 34 Sup. Ct. 10, 58 U. S. (L. Ed.) 101; *State* v. *Baltimore, etc., R. R. Co.*, 78 W. Va. 526, 89 S. E. 288, L. R. A. 1916-F 1001; *Ingraham* v. *Speed*, 30 Miss. 410; *Roseberry* v. *Norseworthy* (Miss.), 100 So. 514; Sutherland Stat. Constr. (2 Ed.), secs. 410-11; *Earhart* v. *State*, 67 Miss. 325; *Ott* v. *Lowry*, 78 Miss. 487; *State* v. *Traylor*, 100 Miss. 544, 56 So. 521, decided by a divided court, departed from the general rule announced in the above cases, but the court in *State* v. *Ware*, 102 Miss. 634, 59 So. 854, overruled in effect *State* v. *Traylor, supra,* and approved and adopted the language of Justice SMITH in his dissenting opinion in the Traylor case.

Applying these tests to the act in question here, it will be seen that the basis of classification for the fixing of the salaries of the county judges under this law, in section 6 thereof, is the assessed valuation of the real and personal property of the counties and that the provisions of section 1 as to population and a municipality of five thousand inhabitants are not used as a basis of classification except in that one section and all salaries for the counties of the state are fixed by section 6 of the act. It will be implied that the legislature intended to fix the salary of the county judge in counties having more than seventeen million dollars assessed value at more than three thousand dollars, for the section fixes the salaries in those counties having fourteen million dollars of assessed valuation *and not exceeding seventeen million dollars assessed valuation* at the sum of three thousand dollars per year. Then the first part of the said section 6 fixes the salaries for all counties in which the act establishes the courts without an election at the sum of thirty-six hundred dollars per year—and these are the counties with more than seventeen million dollars assessed

valuation or more than thirty-five thousand permanent inhabitants; and Bolivar county is shown here to have both the required population and the assessed valuation to come within this classification as to the salary of the judge.

Also, if the court should be of the opinion that no salary is fixed in the said act by implication and the expression of the intention of the legislature, the law would not for that reason be held to be invalid, as that is not a necessary or material part of the law. 36 Cyc. 978 (b); *Harlin* v. *Schafer,* 169 Ind. 1, 81 N. E. 721; *Schwartz* v. *Lake County,* 158 Ind. 141, 63 N. E. 31; *Bennett* v. *State,* 16 S. D. 17, 93 N. W. 643.

The legislature might have created the courts in one act and passed another act fixing the salaries and fees of all the court officers and each of these acts would have been valid irrespective of the other. There are no courts created at the present time by any of the counties of the state in which a salary is not expressly fixed by the law, and the legislature could, at the next session, fix such salaries which in the court's opinion are not fixed by this act, and this would not affect the present law in any way.

As to the law being a violation of section 87 of the Constitution we say that section 87 does not apply to general laws and also that this section, or at least the first two clauses thereof, applies only to individuals and private corporations under the decisions of this court.

IV. Section 91, Constitution of 1890 is not violated. *Magee* v. *Lincoln County,* 109 Miss. 181; *Fidelity & Deposit Co.* v. *Wilkinson County,* 109 Miss. 879. Applying the reasoning of these cases to the facts of the case at bar, we find that the present law under consideration is applicable to all counties in the state and they may adopt it if they come in under the provisions of an election provided for in section 6 of the act.

V. We will next discuss the question that if the court should hold that any clause, paragraph, or part of this

act is unconstitutional and void, then the law should not fail for that reason. For the general rule in Mississippi, irrespective of any saving clause in the act itself, see: *Campbell* v. *Union Bank,* 6 How. 625 (1842).; and *Moore* v. *Tunica County,* 107 So. 659 (1926). There has been one decision of our court directly on the question of these saving clauses. *State ex rel. Melton, Tax Collector,* v. *Rombach* (1917), 73 So. 731.

The lower court erred in sustaining the demurrer to the petition for a writ of mandamus filed herein and in dismissing the petition, and the judgment should be reversed.

*Clark, Hallam & Roberts, Sillers & Pearson* and *W. B. Clark,* for appellees.

We are mindful of the rule in regard to the judicial construction of constitutional provisions which declares that in cases of doubt every possible presumption and intendment will be made in favor of the constitutionality of the act in question and the courts will interfere only in cases of clear and unquestioned violation of the fundamental law. We are also mindful of the further rule that where violation of the Constitution is clear, it is the duty of the courts to say so. *Bell* v. *City of West Point,* 51 Miss. 262; *Thompson* v. *Grand Gulf R. R. & Banking Co.,* 3 How. (Miss.) 240, 34 Am. Dec. 81; *Orrick* v. *State,* 105 So. 465; *Iupe* v. *State,* 105 So. 520.

Granting that the state is in need of a revision of its judicial system, it will not do for the legislature or the courts to undertake to cure defects which may at present exist in the Constitution, but the same should be reached by constitutional amendment.

This question in order to be correctly understood must be traced from the beginning of our government. Prior to the Constitution of 1817 there was naught that is enlightening nor does the Constitution of 1817 shed much light on the question at issue.

Initially, Mississippi had but one system wherein common law and equity were constitutionally merged, but constitutional permission was granted the legislature, if it saw proper, to create both equity and probate courts thereafter.

In 1832 the Constitution was revised and substantially rewritten, article IV. covering the judicial power. Thereunder in section 1, appeared section 144, Constitution of 1817, except for the omission of the phrase "such other courts of law and equity" and the insertion of "such other courts as are provided for."

The High Court of Errors and Appeals was created and minute delineation given as to all matters pertaining thereto. See also sections 11, 14, 16, 18, 23 and 24. It will thus be seen that in 1832 the judicial system of Mississippi assumed its present *status* save that by the Constitution of 1868 there was the elimination of the higher court of chancery. Therefore, when the present Constitution was substantially in effect, there was organized in 1836 a criminal court whose constitutionality came under discussion in *Thomas* v. *State,* 5 How. 28, and therein it was said of the power of the legislature: "For we apprehend that the power to establish and to abolish all such inferior courts as the legislature may deem necessary is unlimited, save by the enumeration which by the Constitution itself has made of particular courts. Such as are included in the enumeration are of course beyond the reach of legislative control."

So the chancery court with full jurisdiction must exist and thereover the legislature is without authority to act and divest that constitutionality vested. Therefore, full equity jurisdiction being constitutionally conferred in this chancery court, the legislature could not derogate from the grant of the power that so thus vested, especially in view of *Houston* v. *Royston,* 7 How. 543. See *Bell* v. *City of West Point,* 51 Miss. 262, and the very able discussion of the history of our courts as set forth in that case.

I.   We first desire to discuss this act as being violative of section 159, Constitution of 1890, conferring "full jurisdiction on the chancery court in certain enumerated matters." In this connection read sections 160-161, of the present Constitution.

Under the scheme provided by this County Court Act, in all matters below one thousand dollars in value, the judicial scheme of this state which has been in effect and which has been recognized by our courts since 1817 is completely overthrown.

In *Houston* v. *Royston,* 7 How. 543, Mr. Chief Justice Sharkey said:  "The legislature can do no more than give a concurrent jurisdiction, *for it cannot divest jurisdiction already vested,* and the Superior Court of Chancery has *full jurisdiction in all matters of equity.* Then we conclude that the Superior Court of Chancery is not so exclusive in its character as to prevent the legislature from acting under the 24th section and establishing inferior courts with equity jurisdiction. There is one limitation which the legislature must observe. *It cannot vest equity jurisdiction in a court of law. The jurisdictions are to be kept separate and distinct."* See also *Adams* v. *Carter,* 47. So. 409.

By the provisions of this bill not only is the legislature attempting to combine in one court both equity and law jurisdiction, but it is attempting to vest an equity jurisdiction in a court of law; and further than that, it is attempting to divest the chancery court of some of the "full jurisdiction in all matters of equity granted that court by the Constitution."

Section 170 of our Constitution provides that the board of supervisors "shall have full jurisdiction over roads, ferries and bridges." This court has repeatedly held that full jurisdiction as set up in this section means that while this jurisdiction may be regulated, it cannot be taken away. *Supervisors* v. *Arrighi,* 54 Miss. 668; *Seal* v. *Donally,* 60 Miss. 658; *Salter* v. *Bolivar County,* 111

Miss. 267; *Board of Supervisors of Holmes County* v. *Black Creek Drainage District,* 99 Miss. 739.

The act in question in this case not only takes from the chancery court and vests in the county court one part of the full jurisdiction granted the chancery court by the Constitution in all matters of equity, but it provides that the appeal from this county court shall lie, not to the chancery court, but to the circuit court and from the circuit court to the supreme court. This renders the act plainly unconstitutional.

We would frequently be confronted with situations where appeals would be prosecuted to the circuit court from the county court and an original jurisdiction hearing had on a purely equitable matter, and from the judgment of the circuit court the appeal would lie directly to this court, the chancery court being thus ignored throughout the transaction. No supervisory control over the acts of this county court is vested in the chancery court as was the case in *Houston* v. *Royston,* 7 How. 543, nor is the chancery court vested with full supervisory and controlling power over the county court, the reason assigned in *Thomas* v. *State,* 5 How. 20, as to why the criminal court was an inferior court.

The act is violative of section 159 of the Constitution which grants the chancery court full jurisdiction in all matters of equity and is violative of the general scheme of the Constitution relative to the judicial power of this state in that it seeks to make of the county court a court both of law and equity, and seeks to vest in a court of law equity jurisdiction.

The question of the exclusiveness of the jurisdiction both in equity and in the justice court is demonstrated by the leading case of *Blanton* v. *King,* 2 How. 858; *Edmondson* v. *Roberts,* 2 How. 822. The matter of the exclusiveness of equity jurisdiction again arises in *Carmichael* v. *Browder,* 3 How. 252; *McRea* v. *Walker,* 4 How. 455; *Bank of Rodney* v. *State of Mississippi,* 4 S. & M. 431; *Steen* v. *Steen,* 25 Miss. 513; *Rabb* v. *Griffin,* 26

Miss. 579; *Wood* v. *Ford,* 29 Miss. 65 *Servis* v. *Beatty,* 32 Miss. 52; *Gilliam* v. *Chancery,* 43 Miss. 437; *Yerger* v. *Foote,* 48 Miss. 62.

These decisions have never been in any way impaired or their efficacy in any way affected; and as a result, they still stand as correct expositions of the demarcation sought to be destroyed by this act.

By *Robertson* v. *Southern Bitulithic Co.,* 92 So. 580, 129 Miss. 453, the inability of the legislature to set aside this mandate of the Constitution, defining juris- diction, was again made clear. Note also: *Brown* v. *Caraway,* 47 Miss. 668; *Planters Ins. Co.* v. *Kramer,* 47 Miss. 200; *Murray* v. *Lehman,* 61 Miss. 283; 4 R. C. L., p. 979, sec. 8; 7 R. C. L., p. 979, sec. 8.

It is urged by counsel for appellant that even though the equity feature of the act should be upheld by this court to be unconstitutional, this court will eliminate this feature of the act and declare the balance constitu- tional, but see: *State* v. *Rombach,* 73 So. 731; *Adams* v. *Standard Oil Co.,* 97 Miss. 880, 908; and *Johnston* v. *Long Furniture Co.,* 74 So. 283. This case is covered by *Conally* v. *Union Sewer Pipe Co.,* 184 U. S. 540, cited in *Adams* v. *Standard Oil Co., supra,* and wherein the whole *anti-*trust statute was held to be unconstitutional be- cause agriculturalists and live stock dealers were ex- empted from its operation.

II. The act is violative of sections 156 and 171, Con- stitution of 1890. *Bell* v. *City of West Point,* 51 Miss. 262, contains a very full and complete discussion of these two sections.

The whole scheme of the proposition of a county court is to divest the justice of the peace courts of all juris- diction and eventually to eliminate them because of non- use, because, if the court please, what possible excuse would exist for a man going into a justice of the peace court and filing a suit which he could file in the county court when the appeal will be taken directly from the

justice court to the county court and his case tried *de novo* there? Again we call the court's attention to *Houston* v. *Royston,* 7 How. 543.

Not only does the county court have jurisdiction of the same character as that of the constitutional justice of the peace court, but it has all of the justice's jurisdiction in all matters, civil and criminal which the Constitution vested in the justice of the peace court, and, in addition, has exclusively the jurisdiction vested in the justice of the peace court by statute, and, also, has full and complete supervisory control and power over the actions of the justice court; and all cases appealed from such a court for any cause whatever are tried *de novo* in the county court.

While our court held that the legislature could legally create a branch of the circuit court to exercise certain of the jurisdiction exercised by the circuit court, and which court was in some respects superior to the justice of the peace court—see *Thomas* v. *State,* 5 How. 20— yet the court held in that case that this court was authorized by the Constitution because it was simply a branch of the circuit court and over it the circuit court exercised full and complete supervisory control and jurisdiction; nor was that court vested with any of the jurisdiction conferred by the Constitution upon the chancery court; nor did it in any way interfere with the operation of the justice of the peace courts, as does the county court under discussion.

A justice of the peace is a constitutional officer and is entitled to protection as such. The office originated with the common law though the name is statutory. 1 Bl. Comm., 349. For his existence the justice of the peace is dependent upon the fees he collects by virtue of the authority of his office. In order to collect his fees he must have an opportunity to exercise the constitutional jurisdiction vested in his office and this exercise cannot be abrogated either directly or indirectly.

By vesting the jurisdiction of the justice of the peace in the county court, it of necessity deprives the justice of the peace of the opportunity to collect sufficient fees to justify the existence of his office, and this would be an indirect abolishment of his office by taking away from that constitutionally created office the fees and emoluments to be derived therefrom. For an elaborate discussion of this proposition, see *Fant* v. *Gibbs,* 54 Miss. 396.

All jurisdiction of all courts in this state was derived from the constitutional grant of authority therefor, and certainly section 172 of the Constitution of Mississippi authorizing the legislature to establish such inferior courts as it might see fit does not override the provisions of either section 156 or section 171, and this court is clearly without any constitutional jurisdiction of misdemeanors because all of that jurisdiction is expressly vested by the Constitution in the circuit court, except such part as is vested by the Constitution in the justice of the peace court, inasmuch as the Constitution provides that the justices of the peace shall have concurrent jurisdiction with the circuit courts "over all crimes where the punishment prescribed does not extend beyond a fine and imprisonment in the county jail."

Therefore, we submit that the trial judge was correct in sustaining the demurrer as the law violates sections 156 and 171, Constitution of 1890.

III. The act is violative also of sections 146 and 156 of the Constitution of Mississippi. Under section 146 the supreme court is vested with all appellate jurisdiction provided for by the Constitution, save that vested by the Constitution in the circuit court; and other than the supreme court the circuit court is the only court which, under the law, can be vested by the legislature with appellate jurisdiction. Under section 156 the circuit court is allowed such appellate jurisdiction as is prescribed by law, but the act here in question attempts to vest in the circuit judge, and not the circuit court, appellate jurisdiction. Note the language in section 5 of the act.

IV.· The act creating the county court is invalid and unconstitutional because it clearly violates the provisions of· section 90 of the Constitution, forbidding a local or special law. This is a local and private law in that it includes within its provisions for the immediate establishment of a county court in every county in this state which has an assessed valuation of seventeen million dollars or more, or a permanent population of thirty-five thousand or more, excepting only the counties of Bolivar and Sunflower, which counties are excluded from the operation of the act because of the fact that the federal census of 1920 did not show either of them to have a municipality located within their boundaries having a population of five thousand or more inhabitants.

The test as to whether a law is a general or special is stated in 25 R. C. L., p. 815, sec. 66. We cannot see how the 1920 census of population of any municipality could have any possible bearing on the *status* of a county having a county court in 1927, seven years thereafter. The classification would have been just as reasonable to have stipulated a county having a municipality in it of five thousand inhabitants, according to the federal census of 1900. Certainly the conditions existing in the county relative to populated centers seven years prior to the act's going into effect could have no possible connection or bearing upon the need of that county for that particular legislation in 1927. *Long View* v. *Crawfordsville,* 164 Ind. 117, 73 N. E. 78, 68 L. R. A. 622, 3 Ann. Cas. 496; *Reynolds* v. *Collier,* 204 Ala. 38; and *Toombs* v. *Sharkey,* 106 So. 273, where our court in two sentences disposed of the constitutionality of the law here in question.

Again section 6, which provides for the salaries of judges in counties which come under the provisions of this act by election, fails entirely to provide a salary for the judge of the courts of Bolivar and Sunflower counties, which are excluded from the operation of the act by the five-thousand inhabitants federal census of 1920 proposition.

144 Miss.—10.

This whole scheme of classification shows very patent-ly on its face that the legislature, for reasons best known to it, desired and intended to exclude the counties of Bolivar and Sunflower from the operation of this law, and that their attempt to disguise the law so as to evade section 90, Constitution of Mississippi, is so faint and clumsy as to challenge ridicule.

V. Finally, this act is unconstitutional for the reason that although it is termed "an inferior court," it is in fact a court whose dignity is equal to that of the circuit and chancery courts, and a court superior to the justice of the peace courts.

The term *inferior court* as used in section 172 means such inferior courts as will not invade the jurisdiction of the several courts created by the Constitution. See *Kemp's Lessee* v. *Kennedy,* 9 U. S. (5 Cranch) 173, 185, 3 L. Ed. 70.

By the use of the term *inferior courts* our constitutional framers had in mind such courts as courts of eminent domain, unlawful entry and detainer, drainage boards, levee boards, commissioners to assess levee damages, and such other inferior tribunals whose jurisdiction is limited and which are created on such principles that their judgments taken alone are entirely disregarded and their proceedings must show their jurisdiction.

Definition of an inferior court has been given by the supreme court of the United States in *Ex parte Cuddy,* 9 Supt. Ct. 703-704, 131 U. S. 280, 33 L. Ed. 154; *Dowell* v. *Applegate,* 14 Sup. Ct. 611, 615, 152 U. S. 327, 38 L. Ed. 463; *Kennedy* v. *Bank of Georgia,* 49 U. S. (8 How.) 586, 612, 12 L. Ed. 1209; *Ex parte Watkins,* 28 U. S. (3 Pet.) 193, 204, 7 L. Ed. 650. See also *Nugent* v. *State,* 18 Ala. 524. This law is unconstitutional and void.

Argued orally by *W. W. Simmons* and *A. B. Sparkman,* for appellant, and *Charles Clark* and *Walter Sillers, Jr.,* for appellees.

Anderson, J., delivered the opinion of the court.

There is involved in this case the constitutionality of what is known as the County Court Act (chapter 131, Laws of 1926, p. 218 *et seq.*). The state, on relation of Rush H. Knox, attorney-general, brought mandamus against appellees, the members of the board of supervisors of Bolivar county, to require them to submit under section 6 of the act to the qualified electors of said county the question whether the County Court Act should be put in force in that county. Appellees refused to enter the order for the election, upon the ground alone that in their judgment the act was unconstitutional. The trial court held the same view, and therefore entered final judgment dismissing appellant's petition for mandamus. From that judgment appellant appeals.

The questions in the case are: What is the correct interpretation of the statute? And, correctly interpreted, whether it is constitutional.

In order to properly consider and determine those questions, it would probably be better to set out in full the sections of the act in question rather than undertake to state their provisions. The constitutionality of the act is challenged on account of certain provisions in sections 1, 2, and 5, the proviso to section 6 (being the last two paragraphs thereof), and section 7. Those provisions of the statute follow:

"Section 1. Be it enacted by the legislature of the state of Mississippi, that in and for each county of the state which has a permanent population of exceeding thirty-five thousand inhabitants, or, not having such a population, has an assessed valuation of real and personal property exceeding seventeen million dollars, and in either event having a municipality therein of five thousand or more inhabitants as shown by the federal census of 1920, there is hereby created and established an inferior court to be known as the county court. The jurisdiction of said court shall be as follows, viz.: It shall

have jurisdiction concurrent with the courts of justices of the peace in all matters, civil and criminal, of which justices of the peace have jurisdiction; and it shall have jurisdiction concurrent with the circuit and chancery courts in all matters of law and equity wherein the amount or value of the thing in controversy shall not exceed, exclusive of costs and interest, the sum of one thousand dollars; and, subject to the provisions hereinafter contained, it shall have jurisdiction concurrent with the circuit court of all misdemeanors charged by indictment, or which may be preferred by affidavit filed by the district attorney or county prosecuting attorney as shall be hereinafter more fully provided. All of which affidavits shall be sworn to before the circuit clerk of the county. It shall have exclusively the jurisdiction heretofore exercised by justices of the peace, in the following matters and causes, viz.: Eminent domain, the partition of personal property, and in actions of unlawful entry and detainer, provided, however, that nothing in this section shall be so construed as to give to the county court jurisdiction over matters of divorce and alimony, matters testamentary, and of administration; minors business, cases of idiocy, lunacy, and persons of unsound mind.

"Sec. 2. The rules of pleading, practice, and procedure in the said county court shall be the same as those now, or which may hereafter be established as governing the several other courts, as respects the several matters mentioned; that is to say, in proceedings which, if there were no county court, would have to be brought in a court of the justice of the peace, or before a tribunal of a justice . . . of the peace, the same practice in the county court shall be followed as if the matter were in said justice court, general or special; and if the matter be such as would otherwise be in the circuit court, the practice shall be the same as in the circuit court; and, if otherwise, the matter would be in the chancery court, the practice shall be the same as that of the chancery court, and

this shall furnish and be the rule for all proceedings in the said county court in the trial of all matters over which it has jurisdiction, provided, however, that all pleadings in the county court shall be in writing and the jury shall be instructed by the judge in the manner now provided by law for instructing the jury in the circuit court.  .  .  .

"Sec. 5.  No appeal or *certiorari* shall be taken from any interlocutory order of the county court but if any matter or cause be unreasonably delayed of final judgment, or decree therein, it shall be good cause for an order of transfer to the circuit court upon application therefor to the circuit judge.  Appeals of the county court shall be to the circuit court on application made therefor and bond given according to law.  Such appeal shall operate as a *supersedeas* only when such would be applicable to case of appeals from the circuit court to the supreme court.  The circuit court shall be deemed always open for the hearings of such appeals and the circuit judge may hear the same at term time or in vacation at any place in his district.  Appeals shall be considered solely upon the record as made in the county court.  If no prejudicial error be found the matter shall be affirmed and remanded to the county court for enforcement.  If prejudicial error be found the circuit court, or judge may reverse and remand the same for a new trial, or may remand the same with direction, or may order the case transferred to the circuit court for a trial therein *de novo*.  Appeals from the county court shall be taken and bond given within ten days from the date of the entry of the final judgment on the minutes of the court, provided, however, that the county judge may within the said ten days for good cause shown by affidavit extend the time, but in no case exceeding sixty days from the date of the said final judgment.  All appeals from courts of justices of the peace, special and general, and from all municipal courts shall be to the county court under the same rules and regulations as are now pro-

vided on appeals to the circuit court, but appeals from orders of the board of supervisors, municipal boards, and other tribunals other than courts of justice of the peace and municipal courts, shall be direct to the circuit court as heretofore. Judgments of affirmance by the circuit court, or of the judge thereof, may be appealed to the supreme court under the same rules and regulations as appertain to appeals from final judgments of said circuit court, but when on appeal from the county court a case has been remanded by the circuit court or judge, or has been transferred to the circuit court for trial *de novo,* there shall be no appeal to the supreme court until final judgment in the circuit court or by the circuit judge of affirmance of the subsequent judgment of the county court.

"Sec. 6. . . . Provided, that in any county not affected by the provisions of this act, and in which a county court has not been established, on a petition of ten per cent. of the qualified electors of such county, addressed to the board of supervisors, an election shall be called by the said board and conducted in the way and manner now provided by law for a special election, for the purpose of determining whether or not said court shall be established in such county; and if a majority vote at such election in favor of a county court, then the election commission shall so certify to the secretary of state, and the Governor shall then issue a proclamation establishing the county court in such county; and, thereafter, at the next succeeding meeting of the board of supervisors the board shall call an election for the election of a county judge, and which election shall be conducted in the way and manner now provided by law for holding a special election; however, any county which may come under the provisions of this act by an election as above provided, may thereafter come from under the act in the same way and manner as herein provided by an election to be held for that purpose; and the salary of the county judge in all

counties which may come under the provisions of this act by a special election, shall be fixed as follows:

"In counties having a total assessed valuation of fourteen million dollars or more, but not exceeding seventeen million dollars, three thousand dollars per annum, in those assessed at eleven million dollars or more, but less than fourteen million dollars, two thousand four hundred dollars per annum; in those assessed at five million dollars or more, but less than fourteen million dollars, two thousand dollars per annum; and in all other counties, of assessed valuation of less than five million dollars, one thousand eight hundred dollars per annum.

"Sec. 7.  The county court shall be a court of record and the clerk of the circuit court shall be the clerk of the county court, and he or his deputy shall attend all the sessions of the county court, and have present at all sessions all books, records, files, and papers pertaining to the term then in session. The dockets, minutes, and records of the county court shall be kept, so far as is practicable, in the same manner as are those of the circuit and chancery courts.  The sheriff shall be the executive officer of the county court; shall he himself, or deputy, attend all its sessions, and he shall serve all process, and execute all writs issued therefrom in the manner as such process and writs would be served and executed when issued by the justice courts, or by the circuit or chancery court according as appertains to the value of the cause or matter in hand.  The clerk and sheriff shall receive the same fees for attendance, and for other services as are allowed by law to the circuit clerk and to sheriffs for like duties in the circuit and chancery courts.  The county prosecuting attorney shall be the prosecuting attorney of the county court and he shall prosecute all cases therein wherein he is now required by law to prosecute, and he shall assist the district attorney in the prosecution of all cases appealed from the county court to the circuit court, in which it is now the duty of the county attorney

or district attorney, now under the law to appear, and prosecute.

"There shall be an official court stenographer of said court to be appointed by the county judge for the purpose of doing the necessary stenographic work of the said court, the said work to be done under the direction of the county judge. The official stenographer of said court shall receive a salary of one hundred dollars per month to be paid by the county out of its general fund. In addition thereto, for the transcript of the record of appeals, he shall be paid the same fees as are now paid stenographers of the circuit or chancery courts for similar work. In all cases filed in the county court a stenographer's fee shall be charged as an item of cost, as follows: A fee of one dollar shall be charged in all cases which, if there were no county court, would have been filed in the justice court. A fee of two dollars shall be charged in all cases appealed to the county court and a fee of three dollars shall be charged in all cases which, if there were no county court, would be filed in the circuit or chancery court. All of said stenographer's fees above mentioned are to be paid into the general fund of the county. . . .

"Sec. 11. If any clause, paragraph, or part of this act shall for any reason be adjudged by any court of competent jurisdiction to be unconstitutional such judgment shall not affect, impair, or invalidate the remainder of this act but shall be confined in its operation to the clause, sentence, paragraph or part thereof, directly in the controversy in which such judgment shall have been rendered."

Appellees contend that the act violates section 90 of the Constitution, prohibiting special or local legislation with reference to certain subjects therein named. If the act is a general law and not a local or special law, the questions arising under that constitutional provision are eliminated from consideration.

In determining the question whether the statute is a general law or a special or local law it will be necessary first to interpret the meaning of the act. In its first section the act involved provides, among other things, that the counties meeting the requirements therein set out shall automatically come under the provisions of the act. Those requirements are that, in "each county of the state which has a permanent population of exceeding thirty-five thousand inhabitants, or, not having such a population, has an assessed valuation of real and personal property exceeding seventeen million dollars, and in either event having a municipality therein of five thousand or more inhabitants as shown by the federal census of 1920," there is established an inferior court to be known as the county court. The first paragraph of section 6 of the act provides, among other things, that "it shall be the duty of the Governor to determine and declare by public proclamation on or before the first day of May, 1926," what counties will come under the act, in which counties there shall be nominated judges at the judicial election of 1926, the terms of office of the judges so elected to begin the first Monday of January, 1927, "and in 1930, and every four years thereafter as counties become eligible, *by election provided for in this section,* to come under this act, the Governor shall so determine and proclaim with like effect as appertains to those proclaimed in 1926," and that, in "determining population the Governor shall not be confined to the federal census, but may resort to such data and means as shall seem to him proper, and his decision shall be final after any judge has been nominated or elected thereunder," and, "when in the last year of any four-year period any county has fallen below the required population, or assessed wealth, it shall be the duty of the Governor so to ascertain and proclaim, thereupon after the expiration of the then four-year term, the county court shall cease to exist in such county." The underscored phrase above quoted, namely, "by election provided for in this section," is a troublesome provision in

the act. The second paragraph of section 6 of the act provides, in substance, that any county not coming under the act automatically may do so by an election, and may go out from under the provisions of the act in the same manner.

It is argued that the act is a local or special law, because the counties automatically coming under the act in 1926, and every four years thereafter, must each, in addition to the required population or assessed value, have a municipality of five thousand inhabitants or more, *as shown by the federal census of* 1920; in other words, that, as to the counties automatically coming under the act, the census of 1920 is made the perpetual guide for fixing the population of the municipalities therein. Appellees' position is, and it seems to be well founded, that such a classification would make the act a local or special law, that the population of municipalities in such counties according to the census of 1920 would not be germane to the purpose of the act; and therefore would amount to an arbitrary and unreasonable classification. We do not so understand the provisions of section 1 of the act as construed with the balance of the act and especially with section 6 of the act. The scheme provided by the act construed as a whole is this: That, in ascertaining the population of the municipalities of counties automatically coming under the provisions of the act, the census of 1920 is the guide only for the counties so coming under the act in 1926. After 1926 the population of a county automatically coming under the act, as well as the municipality therein, is to be ascertained by the Governor as provided for in the first paragraph of section 6 of the act. It is therein provided that, in determining the population, the Governor shall not be confined to any federal census, but may resort to such data and means as shall seem to him proper, and his decision in reference thereto shall be final after any judge has been nominated or elected thereunder. Any other construction put upon the statute would make that provision meaningless.

The language is broad enough to cover the population of the municipalities as well as of the counties. It will be observed that under the second paragraph of section 6 of the act, which provides for the counties not coming under the act automatically to come under and go out from under the act by election, that the Governor has nothing whatever to do with the matter except to declare the court established by proclamation when a county has so voted. He is absolutely barren of any other authority touching the matter.

It follows from these views that the phrase in the first paragraph of section 6 of the act, "by election provided for in this section," is meaningless. It has no place in the statute. With that left out, the act is a sensible, workable scheme, and means this: That the population of the municipalities in counties automatically coming under the act in 1926 are determined by the census of 1920. Every four years thereafter the population of the municipalities, as well as that of the counties, automatically coming under the act, are determined by the Governor, and, in doing so, he is not confined to the federal census, "but may resort to such data and means as shall seem to him proper." The legislature doubtless meant something by the language quoted, "by election provided for in this section," but such meaning is not ascertainable from the act itself, and therefore, whatever the meaning intended, it cannot be enforced by the courts.

In determining the question whether an act is a general law or a local or special law, the courts will look to the substance and practical operation of the law, rather than to its form and phraseology. The constitutional requirement that certain character of laws shall be general and uniform in their operation does not prevent a reasonable classification by the legislature. A law is general in the sense of such a constitutional provision when it applies to and operates uniformly on all members of any class of persons, places, or things requiring legislation peculiar to the particular class dealt with by

the law. A law is general and uniform, although it does not operate on every person in the state. It is general and uniform if it operates on every person who is brought within the classification and circumstances provided for by the law. Where a law is broad enough to reach every portion of the state and to embrace within its provisions every person and thing distinguished by marked characteristics of sufficient importance to make them clearly a class by themselves, it is not a local or special law but a general law, *"even though there may be but one member of the class or one place on which it operates."* (Italics ours.) 25 R. C. L., section 66, p. 815, at page 818. In the case of *Toombs* v. *Sharkey* (Miss.), 106 So. 273, at page 275, the language above quoted from 25 R. C. L., section 66, p. 818, is quoted with approval. Applying these principles to the statute under consideration as we have interpreted it we think leads to the conclusion that the act is a general law, not a local or special law.

Appellees contend that the act is violative of sections 146, 156, 159, 171, and 172 of the Constitution. These sections of the Constitution, except section 172, parcel out to the supreme court, the circuit and chancery courts, and the justices of the peace, all the judicial power of the state. Section 146 confers on the supreme court appellate jurisdiction; section 156 confers upon the circuit court original jurisdiction in all matters civil and criminal not vested by the Constitution in some other court, "and such appellate jurisdiction as shall be prescribed by law." Section 159 confers full jurisdiction on the chancery courts of all matters in equity and certain other matters set out in the Constitution. Section 171 confers jurisdiction concurrent with the circuit court on justices of the peace of misdemeanors, and exclusive civil jurisdiction of causes in which the principal amount in controversy shall not exceed the sum of two hundred dollars. Section 172, under the authority of which the statute here involved was enacted, provides that the legislature "shall, from time to time, establish such other

inferior courts as may be necessary, and abolish the same whenever deemed expedient.''

In substance, appellees' position is that it was not competent for the legislature, under section 172 of the Constitution, to erect a court and to confer upon it such a large part of the jurisdiction of the other constitutional courts as was attempted under this statute to confer on the county court, and appellees lay special emphasis on the contention that no part of the jurisdiction of the chancery court can be conferred on any inferior court set up under section 172 of the Constitution. Nor can appellate jurisdiction be conferred on the circuit court of appeal in equity cases from such inferior courts. The provision of section 172 of the Constitution is not new in this state. Substantially the same provision is found in the Constitutions of 1832 and 1869. Both of those Constitutions, as did the Constitution of 1890, parceled out the entire judicial authority of the state to certain courts therein named. Notwithstanding that fact, there was inserted in each of those Constitutions a provision identical in substance with section 172 of the present Constitution, requiring the legislature to establish such other inferior courts from time to time as might be necessary, and abolish the same when deemed expedient. In 1836 (Laws 1836, p. 25), under the Constitution of 1832, the legislature passed an act creating a criminal court for certain counties in the state; and in 1842 (Laws 1842, chapter 3), under the same Constitution, the legislature passed an act creating a district chancery court. There came before the High Court of Errors and Appeals cases involving the constitutionality of each of these acts. In a very large measure those statutes were attacked on the same ground as the statute here involved is attacked. The Criminal Court Act was passed on and held to be constitutional in *Thomas* v. *State,* 5 How. 20. And the District Chancery Court Act was held to be constitutional in *Houston* v. *Royston,* 7 How. 543. The opinion in the latter case was written by Judge Sharkey; that in the

former was written by Judge TROTTER. Each of those opinions contain a clear and lucid discussion of the principal questions involved under this branch of the present case. In *Houston* v. *Royston,* Judge SHARKEY said, among other things:

"In the outset it is apparent that the convention intended to parcel out to the respective courts created by the Constitution the entire judicial jurisdiction which might pertain to a state or government. None was left undisposed of. We cannot imagine any possible case which is not cognizable by some one of the courts established, and yet we have the strongest possible reason for believing that the convention looked forward to some changes which might be suggested by experience, either from a defect in the practical application of the system then established, or from changes which might take place in the condition of the state. Hence they declared, in the twenty-fourth section of the same article [Const. 1832, art. 4], that 'the legislature may, from time to time, establish such other inferior courts as may be deemed necessary, and abolish the same whenever they shall deem it expedient.' This section is found near the close of the article which established all the courts, and conferred the entire jurisdiction of the state. Such a provision indicates that the convention thought that it might be convenient and proper to make some changes in the judicial system. Nothing else could have induced such a provision. And it must have been the design to clothe the legislature with power to make such changes. Such a provision was not inserted to give the legislature power to provide for the exercise of a jurisdiction which had not been disposed of, for it was all appropriately vested by the Constitution; none remained for legislative disposition. The power therefore to create inferior courts necessarily implies the power to clothe them when created with a part of the jurisdiction which had been vested in the courts established by the Constitution; otherwise they could have no jurisdiction whatever, for the Constitution

had disposed of all. Any other supposition leads to a charge ·of absurdity in the convention, in having done a useless and unmeaning act; and such a presumption is not to be indulged when the act can have a sensible application. It cannot be doubted that the legislature has power to establish some inferior courts. What is meant by an inferior court, in the sense in which that term is used in the twenty-fourth section? The article alluded to enumerates all the courts of the state, beginning with the High Court of Errors and Appeals, and ending with the courts of justices of the peace. Now does the article mean by inferior courts such courts only as are inferior or below all of those mentioned, even down to a justice's court? I do not so understand it; but I understand it to mean that, when the legislature created a court and gave it jurisdiction, it must be inferior to the court created by the Constitution, whose jurisdiction was of the same character as that given to the new court by the legislature. Thus, if the legislature wished to create a court which should exercise a part of the jurisdiction now exercised by the circuit courts, they could only do so by creating a court inferior to the circuit court. For instance: The criminal court exercised jurisdiction given by the Constitution to the circuit court, but it was inferior to the circuit court, and on this ground was held to be constitutional; still, in the ordinary acception of the term, it was superior to other courts, or might have been so in dignity and extent of jurisdiction. . . . The legislature can do no more than give it a concurrent jurisdiction, for it cannot divest jurisdiction already vested, and the superior court of chancery has 'full jurisdiction in all matters of equity.' Then we conclude that the superior court of chancery is not so exclusive in its character as to prevent the legislature from acting under the twenty-fourth section, and establishing inferior courts with equity jurisdiction."

In *Rabe* v. *Fyler,* 10 Smedes & M. 440 48 Am. Dec. 763, the constitutionality of an unlawful entry and de-

tainer court was involved. Among other things, the court
said:

"It is insisted the trial before the justices was uncon-
stitutional. The right of the legislature to establish such
inferior courts as might be deemed necessary, has been
more than once upheld by this court"—citing *Thomas*
v. *State* and *Houston* v. *Royston.*

In *Hughes* v. *State,* 79 Miss. 77, 29 So. 786, the court
considered and passed on the constitutionality of an act
of the legislature establishing a municipal police court
with all the jurisdiction of a justice of the peace and
more. The statute was held to be constitutional. The
court said, among other things:

"The inferior courts established under section 172 of
the Constitution are, in their jurisdiction, independent
of the courts erected under section 171, and the number
of these courts and their respective jurisdictions are
within legislative authority, and their creation can be
complained of only to the legislature itself."

*Pegram* v. *Drainage District,* 108 Miss. 793, 67 So. 453,
involved the constitutionality of a statute making the
board of drainage commissioners under one of the drain-
age acts of this state a court of record. Without passing
on whether it was a judicial tribunal, the supreme court
said, in substance, that, if it was such, then under section
172 of the Constitution it was an inferior court; that its
jurisdiction was limited; that its determinations were
not final and conclusive but subject to review by a higher
court.

It is true that in *Houston* v. *Royston,* 7 How. 543, the
court said that "equity jurisdiction cannot be given to a
court of law," but there are two reasons why that state-
ment of the court is not controlling here: First, it was
not decision. The court was passing on the constitution-
ality of an act of the legislature that did not undertake
to confer equity jurisdiction on a court of law. The stat-
ute involved in that case was a statute establishing a vice
chancery court, and the statute was held to be constitu-

tional. Therefore the statement of the judge who wrote the opinion in that case that, under the Constitution, equity jurisdiction could not be bestowed upon a court of law was beside the mark. Second, under the Constitution of 1832, which governed in that case, Judge SHARKEY who wrote the opinion therein was probably right in his conclusion that the legislature could not confer equity jurisdiction on a court of law. The Constitution of 1832, article 4, section 16, provided:

"The legislature may give to the circuit courts of each county equity jurisdiction in all cases where the value of the thing, or amount in controversy, does not exceed five hundred dollars."

In discussing the question, Judge SHARKEY based his *dictum* on two grounds, namely, that the Constitution of 1832 conferred all equity jurisdiction on a "separate superior chancery court;" and, second, using his language (7 How. at page 550):

"And to prevent the transfer of its jurisdiction and keep it a separate tribunal, the convention declared by a proviso what jurisdiction rightfully belonging to a court of chancery might be transferred to the courts of law. *The effect is to prevent the transfer to those courts of any further equity jurisdiction.*" (Italics ours.)

Judge SHARKEY evidently had in mind the well-established principle of constitutional law which was followed in *State* v. *Henry,* 87 Miss. 125 at page 144, 40 So. 152, 154 (5 L. R. A. [N. S.] 340), in which case it was held:

"Where the Constitution schedules powers, giving or taking away, it must be presumed to have scheduled all, and it only must be looked to, with its necessary implications, for the limit of authority or restriction."

Where the Constitution says to the legislature, You may do thus and so on a certain subject, it is not necessary to follow that with an inhibition that the legislature can go no further. If the Constitution is silent on a subject of legislation, the legislature is supreme. But, where the Constitution speaks, the legislature may go to the

extent permitted by the Constitution but no further, even though the Constitution be silent as to whether it may go further. The Constitution of 1832 said to the legislature: You may give courts of law equity jurisdiction to a certain extent. That meant that the legislature could go no further. There is no such provision in our present Constitution.

We are of opinion that under these decisions of our court the county court established by this act is a constitutional court, and that the entire jurisdiction conferred upon it by the act was authorized by the Constitution, and also that the act is constitutional in so far as it confers upon circuit courts appellate jurisdiction of equity cases appealed from the county courts to the circuit courts as provided in the act.

We are of opinion, however, that in so far as the act confers upon the circuit judges authority to try appeals from the county courts anywhere in vacation without notice is violative of section 14 of our Constitution (the due process section). But that provision of the act does not go to the constitutionality of the entire act. It is clearly separable from the balance of the act. The statute provides for the hearing of such appeals in term time as well as in vacation. Therefore there is left in the statute a remedy by appeal to the circuit court in term time. Section 11 of the act provides that, if any clause, paragraph, or part of the act shall be adjudged unconstitutional, nevertheless the remainder of the act shall stand. We think, therefore, that the validity of the statute is not affected by that provision. The legislature itself, in section 11 of the act, said that it would have passed the act, even though that provision should be held unconstitutional.

*Reversed and remanded.*

McGOWEN, J. (dissenting).

I believe beyond a reasonable doubt that the law here under consideration, which I shall denominate ''the

County Court Bill," is unconstitutional and void, and that the lower court was correct in so holding, and shall briefly state my reasons for "the faith that is within me."

1. It will be observed that section 1 of chapter 131, Laws of 1926, creates an inferior court in counties having a permanent population exceeding thirty-five thousand inhabitants, or, not having such a population, having an assessed valuation of real and personal property exceeding seventeen million dollars and in either event having a municipality therein of five thousand or more inhabitants *as shown by the federal* census of 1920.

It is my deliberate judgment that this section sets up an inferior court in ten counties of the state (as we are advised by the briefs) according to the arbitrary standard of population as to cities according to the census of 1920, without regard to the population of any city in any county in any year subsequent to the year 1920 and prior to the enactment of the legislation. Standing alone, we have this section 1 creating this inferior court without regard to the desires of the people of the counties described; in other words, without an election, the law mandatorily applies to the counties described based upon a situation long since past, and would apply to a state of facts different from any other provision for creating a county court in any other county in the state subsequent to the year 1926; and I believe this statement to be true, viewing section 1 separately and viewing it together with all the other sections of the act, which I am admonished I must do.

I think this is true, notwithstanding the amendment by this court, striking from section 6 the words "by election provided for in this section," which the majority opinion has decided are meaningless and would render the subsequent part of section 6 unintelligible down to the proviso, thereby enabling the court to say that the law is general because then the Governor may automatically proclaim that other counties are subject to the provision of the law.

The same argument would apply to the fact that in the subsequent part of section 6 there is the provision that, upon the compliance with certain conditions, the people may hold an election and vote to come under the provisions of the act. Those counties which come under by election are not in my opinion in the same class as the counties described specifically in section 1 of the act; and, if the last two sentences were stricken from the act as well as the clause beginning with "and in 1930" was stricken from the act, there can be no question but that section 1, entirely separable and distinct from section 6, would be a local act, which excluded ten counties in the state from the right to have any voice in whether they chose to be subjected to this law or not. I do not think this provision can be gainsaid. Applying the rule announced in the main opinion, and judged by the rule announced in *Toombs* v. *Board of Supervisors* (Miss.), 106 So. 275, this act would be local, because some counties are expressly excluded from sharing in rights accorded other counties, and under this act can never occupy the same position with reference to this law. As amended by this court section 6 in part would read:

Clause 1:

"And in 1930 and every four years thereafter as counties become eligible to come under this act the Governor shall so determine and proclaim with like effect as those proclaimed in 1926."

Clause 2:

"On determining population the Governor shall not be confined to the federal census, but shall resort to such data and means as shall seem to him proper and his decision shall be final after any judge has been nominated or elected thereunder."

Clause 3:

"When in the last year of any four-year period *any county* has fallen below the required population or assessed wealth, it shall be the duty so to ascertain and

proclaim, thereupon after the expiration of the then four-year period, the county court shall cease to exist in such county.''

But it is argued that, with section 6 thus amended by striking the words quoted, we have a perfectly workable scheme by which section 1 is applied by the Governor to other counties than the ones specifically described in section 1. The fallacy of this argument is that the class of counties described become subject to the county court law under and by virtue of the federal census of 1920, while, as to the other counties which the Governor may declare within the provisions of the act, the Governor has the power to resort to any data and measure he desires to ascertain population. This is so clearly a distinct classification from the one described in section 1 or the other described in the proviso in section 6 as to make it seem to me beyond cavil that the correction only intensifies and accentuates another and different classification. If I am correct in my analysis and view of section 6 as amended by the majority opinion, then without question this is a local law. But I want to state distinctly that I do not think the court is authorized, in view of the provision that the Governor is directed to proclaim counties voting for this county court project as being subject to the terms of the act, renders the words which have been deleted meaningless, but, if applied to the proviso of section 6, makes a perfectly workable scheme as to counties becoming eligible after holding an election and voting in favor of the scheme, and it is the duty of the Governor to so proclaim, and I do not think it would render the last two sentences meaningless and unintelligible. Unquestionably the language would be rendered awkward and lacking but not unintelligible. Construed fairly, it means that, as to the *status* in 1930, the Governor is not confined to the federal census of 1920, and eliminates cities of five thousand or over.

Especially is this true, if without deletion the last sentence in the above quotation is construed as being modi-

fied by and related to, the next to the last sentence, connected up with the balance of section 6, it is workable and every word retained and fairly construed. In other words, read clause 2 without deletion as following clause 3.

In 1930, however, the court knows, and it is a matter of common knowledge, that under the federal law there is to be another census which is never completed and announced in time for the elections to be held (under the laws now existing), and of necessity the Governor would then be permitted, if he chose to have his own census made, or, without any census, perhaps on his own judgment of the population, declare a county in or out from under the provisions of the act.

Assuming, then, that the law is local, and the whole history of the legislation shows that it was a local law in its inception and design that the legislature materially amended and which has now been materially amended again by this court in my opinion, then in that event this law becomes unconstitutional, because it violates section 89 of the Constitution, which is as follows:

"There shall be appointed in each house of the legislature a standing committee on local and private legislation; the House committee to consist of seven representatives, and the Senate committee of five senators. No local or private bill shall be passed by either house until it shall have been referred to said committee thereof, and shall have been reported back with a recommendation in writing that it do pass, stating affirmatively the reasons therefor, and why the end to be accomplished should not be reached by a general law, or by a proceeding in court; or if the recommendation of the committee be that the bill do not pass, then it shall not pass the house to which it is so reported unless it be voted for by a majority of all the members elected thereto. If a bill is passed in conformity to the requirements hereof, other than such as are prohibited in the next section, the courts

shall not, because of its local, special, or private nature, refuse to enforce it.''

It will be noted that section 87 requires that the legislature shall not enact local laws in certain cases which are, or can be, provided for by general law, unless and until the legislature complies with section 89, which relieves from the prohibition of section 87, and provides that, if the constitutionally named committee on local and private legislation shall report back in writing that a bill do pass, stating affirmatively the reasons therefor, and why the end to be accomplished cannot be reached by general law or court proceeding, then in that event, notwithstanding section 87, the courts will not be permitted to strike down a law passed in conformity to the requirements of section 89, which but for section 89 would be declared local by the courts. See *Yazoo & Mississippi Valley Railroad Co.* v. *Southern Railway Co.,* 83 Miss. 746, 36 So. 74. Otherwise, under section 87, the law could not stand.

This law, being local, was not referred to a committee named and created by the constitution and given power over this class of legislation superior to that of the legislature itself. The journals show that this law, not being recommended by such committee, did not receive the majority vote required by section 89; not so recommended by the said committee, the bill was referred to the judiciary committee. There was never any recommendation of the committee that a general law could not be passed that would meet the end sought to be accomplished.

These statements are made by me after an examination of the journal and certificate of its contents made to me by the custodian thereof; and they show that section 89 was ignored. In other words, the legislature may evade the provisions of section 89 by declaring in a legislative sense that the law is general. In that way the court would be powerless to prevent wholesale violations of the fundamental law of the land. But I go further,

and I say that the committee could not certify that a general law could not have been passed, for provision could have been made by the legislature for a constitutional circuit judge and a constitutional chancellor in each county of the state if such emergency or necessity arose.

But it may be urged that this conclusion of mine has been reached by recourse to the journals of the House and Senate, and to the fact (which is a fact) that the above-described violation of section 89 is a matter of proof on answer not raised here by demurrer. I concede that to be true; but such a revolutionary change of the judicial system of Mississippi, and the effort of the legislature to do that which the framers of the Constitution of 1890 refused to do, impels me to express my opinion here in order that elections may not be held, and then, when the court has been established in a later procedure, declare the act unconstitutional.

I think all the questions are so raised as to call upon this court to say whether or not the county court can function, especially in view of the fact that the lower court held the law void. It will also occur to lawyers that this court in the *Wrenn Case,* 63 Miss. 512, 56 Am. Rep. 825, held that the courts would not have recourse to the journals of the legislature in order to determine the form of the bill as passed. And subsequently, in the case of *Hunt* v. *Wright,* 70 Miss. 298, 11 So. 608, Judge CAMPBELL held that, as the rules of procedure ending with section 77 were to be enforced by the legislature, the courts would not supervise the legislature as to its conscience in its action with reference to these rules. It will be noted, however, that Judge CAMPBELL was careful to limit his decision to rules of procedure. I cite the following authorities which announce the *contra* doctrine: *Gardner* v. *The Collector,* 6 Wall. 499, 18 L. Ed. 890; *Town of South Ottawa* v. *Perkins,* 94 U. S. 261, 24 L. Ed. 154; *Bradley* v. *West,* 60 Mo. 33; and many others that might be added.

But, applying the rule announced by Judge CAMPBELL, this section 89 is a part of the Constitution denominated

"local legislation," which by section 89 sets up a committee constitutionally charged with the duty of finding certain facts before the legislature could act upon a given case, and is as firmly fixed in its jurisdiction as the legislature itself, or the Supreme Court, and, when the legislature ignores this section entirely, it cannot be said that it is one where the courts may not refer to the journals to ascertain whether or not the conditions necessary to confer jurisdiction, if you please, upon the legislature, have been complied with.

The weight of authority, being in my judgment that recourse may be had in any proper case to determine if the legislature has authority, the Constitution has special force here, where we are not dealing with a rule of procedure but dealing with that clause of the Constitution which names a condition precedent to the legislature having the right to legislate upon a given subject, and in my judgment clearly limits the power of the legislature to the prescribed method.

I think this is fundamental, vital, and that, if the courts of the land may not protect from a violation of this section, then we have gone far backward in ascribing to the legislature more power than was accorded by the English people to the English Parliament in the days of long ago. I think it is for us to say that, if the journal shows that the Constitution has been violated with reference to local legislation, the courts will see that the mandates of the Constitution are complied with. If the legislature may with impunity violate this section, then it would be difficult to arraign any man for any violation of our fundamental law. The great power conferred upon it, the great confidence reposed in it, the weal and woe of the state being dependent upon it, the legislature, the Governor, the supreme court, all alike must obey the Constitution, or real mischief will ensue.

Believing that section 89 has been violated and that the material part of the law and the main intention of the legislature in creating the law would be thwarted and

rendered nugatory I think there would be no good reason for not declaring the entire law unconstitutional, as not being workable, as having violated the section of the Constitution, *supra.*

2. This law undertakes to confer upon the county court blended jurisdiction of equity and common-law cases to the amount of one thousand dollars, creating the judge of the court both circuit judge and chancellor.

I think this is contrary to the spirit and letter of the Constitution as set out in those sections which define the jurisdiction of circuit and chancery courts. An effort by the legislature to blend the jurisdiction, if successful, will ultimate in the accomplishment by the legislature of that which was obviously defeated in the constitutional convention of 1890. I think that it was clearly not the intention of the constitutional convention of 1890 that the jurisdiction of these courts should be blended and merged into one court; and certainly section 147 does not upset all the other sections as to one judicial system. Instead of creating an inferior court, the judge of this court would be vested with far more power than is now lodged by the Constitution in either the circuit judge or chancellor. I think, when the chancery court was vested by the Constitution with "full" jurisdiction of all matters in equity, that no other court can be created which practically ousts it of jurisdiction entirely and exclusively of that subject, and, if an inferior court is attempted to be created, it must be created as an inferior court of equity. I think our Constitution was passed in the light of the opinion of Chief Justice SHARKEY in the case of *Houston* v. *Royston,* 7 How. 543, in which Judge SHARKEY said:

"The legislature can do no more than give it a concurrent jurisdiction, *for it cannot divest jurisdiction already vested,* and the superior court of chancery has 'full jurisdiction in all matters of equity.' Then we conclude that the superior court of chancery is not so exclusive in its character as to prevent the legislature from acting

under the twenty-fourth section, and establishing inferior courts with equity jurisdiction. There is one limitation which the legislature must observe. It *cannot* vest *equity* jurisdiction in a *court of law.* The jurisdictions are to be kept separate and distinct."

It will be noted that Judge Sharkey was of the opinion that equity jurisdiction could not be conferred under the Constitutions then in existence, and it is a far cry to say that, because the Constitution makers of 1890 changed slightly the name of the court, the forceful declarations of Chief Justice Sharkey were thus avoided (I refer to the use of the word "superior" with reference to the chancery court).

In the case of *Adams* v. *Carter,* 92 Miss. 579, 47 So. 409, 16 Ann. Cas. 76, Chief Justice Whitfield said:

"Mississippi is one of the five states of the Union which have always rigidly maintained, unwisely, as the writer thinks, the distinction between law and equity, and an absolutely separate chancery system, administered by a chancery court according to the long-settled principles of equity jurisprudence and practice."

But it may be argued that section 147 of the Constitution prevents this court from reversing either the circuit or chancery court because of an erroneous decision as to jurisdiction. My view is that that section simply cuts off the right of appeal on that question, and cannot by any stretch of the imagination be held to vest in the legislature the power to undo and nullify all the sections of the Constitution marking out and defining the jurisdictions of the two courts.

Referring to the journal of Mississippi Constitutional Convention of 1890, I find that at pages 370 and 371 Mr. Blair offered the following, clearly conferring equity jurisdiction on the circuit courts:

"The distinction between law and equity and actions at law, and suits in equity and the forms of all actions and suits heretofore existing in this state, are hereby abolished, and there shall be in this state hereafter but

one form of action for the enforcement or protection of private rights and the redress of private wrongs, which shall be denominated *a civil action;* and all courts which are vested with civil jurisdiction shall administer both law and equity in the same suit and for either party, and when the rules of law and equity in any case shall differ, the rules of equity shall prevail. The judicial power of the state shall be vested in a supreme court, circuit courts, and such other courts as the legislature may hereafter establish,''—which was not · adopted. Again in same journal, at page 422 et seq., Mr. BURKETT offered a substitute, giving the legislature the power to confer equity jurisdiction on the law court and abolishing the chancery court, which was laid on the table (page 425).

So the framers of our Constitution distinctly declined to do what is sought to be done by the legislature here, and in my judgment affirmatively declined to give the legislature the power to confer equity jurisdiction on a law court.

As analogous to the case here, section 170 of our Constitution provides that the board of supervisors shall have *"full jurisdiction over roads, ferries, and bridges."* In the case of *Supervisors* v. *Arrighi,* 54 Miss. 668, Mr. Justice CHALMERS, as the organ of the court, said:

''Jurisdiction over roads, ferries, and bridges is by the Constitution conferred upon the boards of supervisors, just as equity jurisdiction is conferred upon the courts of chancery and appellate jurisdiction upon this court. It is not within the power of the legislature to take away these several jurisdictions, or bestow them upon other tribunals.''

In the case of *Seal* v. *Donnelly,* 60 Miss. 658, the same judge speaking for the court said, with reference to boards of supervisors and section 170:

''The right to deal with these subjects cannot be taken from them and confided to any other magistracy.''

In the case of *Board of Supervisors of Holmes County* v. *Black Creek Drainage District,* 99 Miss. 739, 55 So.

963, with reference to section 170 and the meaning of the words "full jurisdiction," Mr. Justice ANDERSON said:

"In other words, to the extent provided by the statute" (speaking of drainage districts) "the jurisdiction of the public roads, in these drainage districts, is taken away from the board of supervisors and conferred on the drainage commissioners. *In our judgment, it would be hard to conceive of a statute more clearly violative of the clause in question of section 170 of the Constitution.*"

This act here under review confers jurisdiction of all equity matters where the amount involved is less than one thousand dollars, and vests it in the county court without any provision for supervision or without any method by which the court having constitutional jurisdiction of equity ever has anything whatever to do with reference to this class of cases of which the county court essays jurisdiction.

But even more serious than the blending of the courts is the direct, positive action of the legislature in this act in vesting in the circuit court the power to remove any cause in equity for good cause to its court (the circuit court), and there try the cause, when forsooth it concluded that the county court had not promptly and legally proceeded with the case. There is not even the gossamer veil of disguise over the nude form of this evasion of the Constitution conferring "full" jurisdiction in equity matters in the chancery court. It is a positive, direct, straightout placing of jurisdiction of an equity matter in the circuit court. Then, too, upon appeal, the circuit court may, if it sees proper, review the county court's trial of the case in equity and try this case *de novo,* and sit as a chancellor of a chancery court.

I do not believe there is any authority in any decision in our Mississippi jurisprudence that warrants or approves of this effort of the legislature to do what the Constitutional Convention of 1890 affirmatively refused to do when Mr. Burkett undertook to blend the courts, circuit and chancery, into one. The authorities I have cited

and the sections of the Constitution speak so emphatically as seem not to call for further elaboration. All these cases of which the chancery court has exclusive jurisdiction are settled without ever having once entered the doors of an equity court. I think this effort to confer jurisdiction of equity cases upon the lower court is unconstitutional, and that now we cannot say which of the two, the equity or common-law jurisdiction, the legislature intended to stand if the other should fall, and for that reason the entire act is unconstitutional and void.

I think the conferring of jurisdiction upon the circuit judge to sit as a chancellor and try an equity case *de novo* is utterly repugnant to the letter and spirit of the several sections of the Constitution creating and defining the jurisdictions of the circuit and chancery courts, and that for this reason the statute is unconstitutional and void, and that we cannot now say whether the legislature would have retained the equity jurisdiction or the common-law jurisdiction, and the volume of litigation would certainly have influenced the legislature in the passage of the act, and we do not believe that the legislature could have intended for this act to stand when so much of the jurisdiction conferred by the legislature should be declared to be void.

We think this jurisdiction of equity and law conferred upon the county court and upon the circuit court renders the provisions of this act interdependent, and that the constitutional cannot be segregated from the unconstitutional. *Ballard* v. *Oil Co.*, 81 Miss. 573, 34 So. 554 (62 L. R. A. 407, 95 Am. St. Rep. 476), wherein this court said:

"Severance of a statute takes place only where both sets of provisions, constitutional and unconstitutional, appear upon the face of the statute itself, and the court separates, if the provisions are not interdependent, the constitutional from the unconstitutional, and strikes from the statute the unconstitutional provisions, leaving the constitutional provisions in the statute."

I am therefore of the opinion:

(1)   That on the face of this law it is local and not general, therefore violates section 87, unless the local law was passed by the legislature in conformity to section 89, and that, under section 89, the courts by clear implication are given the authority to ascertain by the journals of the legislature, whether or not section 89 has been complied with substantially, and thus, having recourse to section 89 and ascertained that said section was wholly ignored, I find that section 87 is violated because in my opinion a general law could have been passed affording full, complete, and adequate relief, without revolutionary disturbance of our present splendid judicial system as planned by the Constitution of 1890, and this construction in no wise conflicts with *Hunt* v. *Wright, supra;*

(2)   Because appellate and supervisory jurisdiction is conferred upon the circuit judge to try *de novo,* equity cases, which but for this law, it would be his duty to transfer to the chancery court; and

(3)   Because jurisdiction of equity cases is vested in the law court, the lower court, and thus violates all the sections of the Constitution defining the separate jurisdictions of the chancery and circuit courts.

Smith, C. J. (dissenting).

I agree in the main with what my Brother McGowen has said, and will only discuss briefly the right of this court to decline to give any effect to the words, ''by election provided for in this section,'' in section 6 of the statute.

It is clear from the arrangement of the various clauses of section 1 of the statute that the provision therein for the ascertainment of population by the census of 1920 does not apply to counties but only to municipalities. Any doubt that could arise relative thereto is removed by the provision of section 6 of the statute that:

''When in the last year of any four-year period any county has fallen below the required population  .  .  .

it shall be the duty of the Governor to so ascertain and proclaim, and thereupon after the expiration of the then four-year term the county court shall cease to exist in such county.''

No provision is made in section 6 for the ascertainment by the Governor of the population of municipalities and the statute nowhere contains a provision that a county in which section 1 of the statute requires a county court to be established because of its now having a population of thirty-five thousand and a municipality of five thousand inhabitants shall lose its court in event it continues to have the required population but ceases to have a municipality of five thousand inhabitants. In other words, section 6 provides for the abolishment of a county court established by section 1 in a county which now has a population of more than thirty-five thousand, and has within its border a municipality of five thousand inhabitants, in event the population of the county falls below thirty-five thousand, but not, when the population remains thirty-five thousand, but it ceases to have within its border a municipality of five thousand inhabitants.

The words, ''by election provided for in this section,'' in section 6 render the preceding and subsequent language of the section somewhat ambiguous, and I suspect that they and the provision in section 1 as to the population of a municipality were not in the statute when it was originally drawn, but crept in by amendment. If you eliminate these provisions from the statute, it becomes plain and unambiguous. It would then provide for a court in each county that now has or hereafter may have the required population or wealth to remain in existence only so long as the county continues to have such population or wealth, and that courts shall be established in all counties not now or hereafter having the required population or wealth only on an affirmative vote therefor in an election called for that purpose. By the addition of the words, ''by election provided for in this section,'' after the words, ''as counties become eligible,'' the right

of counties not now within the class described in section 1 to come under the statute because of an increase in their population or wealth was negatived, and their right to do so was restricted to an affirmative vote in an election called for that purpose under a subsequent provision of the statute.

What the legislature intended by the municipality provision of section 1 and by the words, "by an election provided for in this section," in section 6, was to establish a court in the counties having a population of thirty-five thousand or property assessed at more than seventeen million dollars, that now have within their borders a municipality of five thousand, and, to repeat, to provide that courts be established in all other counties, regardless of any increase in their population or wealth, only on an affirmative vote in an election called for that purpose. This intention of the legislature is plain, and should be given effect, although so to do might cause the statute to violate the Constitution or render portions thereof ambiguous, which if ambiguous, should be interpreted so as to accord with this intention. Two of the most elementary rules for the construction of a statute are: First, it should be construed as a whole and any ambiguous words therein should be interpreted so as to accord with the manifest intention of the legislature as disclosed by the statute when so construed; and, second, every word in the statute should be given effect and no word therein should be rejected unless it is manifest that it crept into the statute by a clerical error, or not to reject it would lead to a result so absurd that it is manifest from the whole statute that the legislature never intended it.