DRUMMOND *v.* STATE.

(In Banc. Dec. 12, 1938.)

[185 So. 207. No. 33366.]

**W. I. Munn,** of Newton, **R. H. Day,** of Decatur, and **Brewer & Hewitt,** of Jackson, for appellant.

**W. W. Pierce**, Assistant Attorney-General, for the State.

**Anderson, J.,** delivered the opinion of the court.

The appellant was indicted in the Circuit Court of Newton County of the crime of forgery. The Circuit Court transferred the case to the County Court of that county, where a trial was had, resulting in his conviction and sentence to the penitentiary for a term of five years. From that judgment the appellant appeals to the Supreme Court, under the authority of chapter 256, Laws of 1932, which expressly authorizes appeals from the county courts to the Supreme Court in such cases. The appellant made a motion in the Supreme Court to transfer the case to the Circuit Court as a court of appeals, basing such action upon the ground that the statute authorizing an appeal direct to the Supreme Court is unconstitutional.

The question presented has already been decided adversely to the appellant's contention as will hereinafter be noted, but if the question were res nova the decision would still have to be that the motion is not well taken and that the act is constitutional.

In the first place, care must be taken that the court shall not enter upon the discussion of public policy in deciding this question. This consideration, when a statute is under review, belongs to the legislature, not to

the courts; and, in the second place, care must be taken also not to confuse the superintending power with the appellate power.

The power of a superintending control over inferior tribunals is separate, independent, and distinct from that jurisdiction which is appellate. See Re Phelan, 225 Wis. 314, 274 N. W. 411, as reported in 112 A. L. R. 1345, especially note (b) pp. 1358, 1359, referring to numerous decisions in other jurisdictions so holding. The power of superintendence by a superior court of original jurisdiction over an inferior court exercising similar jurisdiction arises out of the common law, independent of statute, and continues to exist unless and until expressly withdrawn by statute; while, on the other hand, the appellate jurisdiction is solely a creature of statute and exists in no case unless conferred by statute, and then only in the manner and to the extent so conferred, on which latter points see Worley v. Pappas, 161 Miss. 330, 135 So. 348; McClanahan v. O'Donnell, 148 Miss. 478; 114 So. 336; Dismukes v. Stokes, 41 Miss. 430; also 3 C. J. pp. 356, 357.

The subject of appeals belongs exclusively to the adjective or procedural side of the law and is a subject upon which the legislature has plenary power, there being no section of the Constitution which expressly limits the legislative power in that respect save only that it is provided that appeals must be allowed from justices' courts. But even there it does not say to what court or courts these appeals may or must be taken. Thus the language found in Dismukes v. Stokes, 41 Miss. pages 430-433, expresses the true and correct rule. There the Court said in part: "For this reason, by universal acquiescence, the power is conceded to the legislature to prescribe the forms of actions and the modes of proceeding in courts, and to limit the cases and the extent to which certain remedies may be pursued. . . . The right to prosecute a writ of error or an appeal in this or any inferior court, is a matter pertaining to the mode of

judicial procedure or the remedy. . . . When the legislature has passed laws regulating the mode of proceeding and limiting the cases and the courts in which the right may be exercised, the rules prescribed must be followed, because they are clearly such as the legislature had power to enact. Nothing appears to be more clearly within the legislative power over matters pertaining to public policy, than the question, in what cases and to what courts shall a party be entitled to an appeal or a writ of error?''

It follows, therefore, inescapably, that since the legislature has plenary power over this subject of appeals, it could prescribe that an appeal from this inferior court in this class of cases, or in any other particular class of cases, might be direct to the Supreme Court. If the power of the legislature in this regard is to be restricted or limited, then some section of the Constitution must be pointed to which so limits or restricts the power. As already mentioned, no such section of the Constitution can be found. It is, therefore, a matter solely for the legislature to decide, and the legislature having so decided, the Court is without power to avoid this said legislation.

But, as already said, the point has already been decided by this Court against the contention of appellant. In the act creating the inferior criminal court, dealt with in Thomas v. State, 5 How. 20, the appeals were allowed directly to the highest appellate court, and the very appeal dealt with in that case was direct from the said inferior court to the high court. The act creating the inferior court of chancery dealt with in Houston v. Royston, 7 How. 543, allowed appeals therefrom either to the superior court of chancery or directly to the high court, and the appeal dealt with in that case was direct from the inferior court to the high court. Both acts were sustained and necessarily that part allowing the direct appeals, else the appeals would have had to be dismissed for want of jurisdiction of them. When a court takes

jurisdiction, it inescapably decides that it has jurisdiction.

It is true that in the opinions in those two cases nothing was said about the validity of that part of the statute allowing direct appeals from the inferior court to the high court. But it can never be assumed that the distinguished judges who composed the Court at that time were not acquainted wth the rule theretofore established as early as Stamps v. Newton, 3 How. 34, that it is the duty of an appellate court to inquire of its own motion, even though the question is not raised by the parties, whether the appellate court has jurisdiction. As said in Mississippi State Highway Department v. Haines, 162 Miss. 216, at page 227: "The Supreme Court in all cases is bound to inquire into its own jurisdiction, and decline to exercise a power not conferred upon it by law. And, if the question of jurisdiction is not raised by either of the parties to a cause, it is the duty of the Supreme Court to raise it of its own motion." As stated by the Supreme Court of the United States in Morris v. Gilmer, 129 U. S. 315, 325, 32 L. Ed. 690, 694: "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself even when not otherwise suggested, and without respect to the relations of the parties to it."

The high court in the two cases above mentioned was theretofore bound, as a fundamental duty, to ask the question and answer for itself whether it had jurisdiction of those appeals. And it did not have jurisdiction unless the statutes allowing the direct appeals to it were valid. When it took jurisdiction and proceeded with the appeals, it necessarily decided what it was bound to decide, namely, that that portion of the statute was valid which conferred the right of such appeal, else, as said, the court could not have done anything else than dismiss

the appeal. When a court proceeds to judgment, it necessarily implies a finding by the court that it had jurisdiction, 34 C. J. 925; 3 C. J. 371, 372; also 15 C. J., pp. 851, 852.

The section of the Constitution of 1832, to wit, Section 24 of Article 4, under which those cases were decided, is in the same words as Section 24, Article 6, Constitution of 1868 and Section 172, Constitution of 1890. When the makers of the Constitution in the Convention of 1890 came to examine that section and were bringing it forward into the Constitution as Section 172, and knew, as they are conclusively presumed to have known, that the high court had held that it would take jurisdiction of appeals from an inferior court created under that section, and they did not make any change in its words whatsoever, they thereby authorized the Supreme Court in all future cases of direct appeals from an inferior court to take like jurisdiction; in other words, Section 172 became of the same force and effect as if there had been added the following words—''And appeals from the courts created under this section may be taken direct to the Supreme Court if so prescribed by the Legislature.''

As shown by the authorities cited, 12 C. J., p. 717, notes 6 and 9, ''The reordainment, in substantial reproduction, of a provision of the organic law, or such reenactment of a statute, operates the adoption therewith, of the settled construction which the judiciary has placed upon the law. The reason for the rule is that, if it were intended to exclude the previous construction, the legal presumption is that the terms of the provisions would have been so changed as to effect that intent.''

It has been argued that inasmuch as the high court did not mention the subject of its jurisdiction, or the question of the direct appeal, it may be considered that it did not pass upon that question. The authorities above cited are distinctly contrary to any such argument, for the court was bound to pass upon the question, as already shown. Therefore, instead of assuming that it did not

pass upon the question—which assumption would be that it was oblivious of its duties in the premises—we must rather assume that it considered the question so plain, that the validity of the statute in that respect was so obvious, that it required no discussion of the point.

Ex Parte Tucker, 164 Miss. 20, 21, 143 So. 700, does not stand in the way of what we are deciding in the present case. There was involved in that case the constitutionality of the statute authorizing the Circuit Courts to transfer felony cases to the county courts. The statute was upheld. In discussing the question the Court used this language in part: "It is competent, therefore, to create a court which may be permitted to exercise in full measure the same jurisdiction as the circuit court, so long as the circuit court shall be superior thereto and this attribute of superiority is accomplished by giving the circuit court the controlling authority of reversal, revisal, correction, and direction over the new court, as by certiorari, appeal, etc." The Court did not hold that the constitutionality of the new statute depended on the right of appeal to the Circuit Court, although it used the words "reversal" and "appeal" along with "revisal, correction, and direction." The authority of the Circuit Courts to make such transfers to the county courts is itself supervisory in nature.

We shall not undertake to mark the line between appellate and supervisory authority until it becomes necessary to decision. It is not necessary to decision in the present case, because we have here, clearly and distinctly, appellate authority.

The motion is overruled.

**Smith, C. J.**, delivered a concurring opinion.

The appellant was convicted in a county court of a felony on an indictment that had been transferred to it by the circuit court. Section 704, Code of 1930, grants appeals from judgments of a county court only to the

circuit court but it was amended by Chapter 256, Laws of 1932, by providing: "that when appeals are taken in felony cases which have been transferred from circuit court to the county court for trial, and have been there tried, such appeals from the judgment of the county court shall be taken direct to the Supreme Court of the State of Mississippi." Pursuant to this amendment, the appellant appealed from his judgment of conviction direct to this court. He now says that this amendment to Section 704 of the Code of 1930 is void under Section 172 of the Constitution and by motion requests us to transfer the case to the circuit court of the county in which the case was tried. In order to comply with this request, it will be necessary for us to hold this amendment to Section 704 to be void. Should we so hold, this court will be without jurisdiction of the appeal and it would be necessary for us then to determine whether we have the power to and should transfer the case to the circuit court.

An appeal from one court to another is not a matter of right under our Constitution, but may be granted by the legislature. If the Constitution requires an appeal when granted to be to a particular court, this requirement must be obeyed by the legislature. The appellant's contention is that Section 172 of the Constitution requires appeals from this legislative county court, when granted, to be to the circuit court; for the reason that the county court is inferior to the circuit court, should therefore be under its supervision and control, and that an appeal is one of the means by which a court exercises supervision and control over another court.

Section 172 of the Constitution provides that: "The legislature shall, from time to time, establish such other inferior courts as may be necessary, and abolish the same whenever deemed expedient."

The statute, now Chapter 17, Code of 1930, creating county courts was held valid under that section in State ex rel. Knox v. Speakes, 144 Miss. 125, 109 So. 129, but

as all appeals then lay from these courts to the circuit court, the question here presented was not there involved.

In interpreting Section 172 of the Constitution two questions arise, (1) To what court created by the Constitution must the legislative court be inferior, and (2) What is the test by which to determine whether a legislative court is an inferior court? The first of these questions was decided in Houston v. Royston, 1 Smedes & M. 238, wherein the court held that the legislative court must be inferior to the constitutional court, a part of the jurisdiction of which it exercises. So that we come at once to the second. There are three universally recognized tests for determining whether a court is an inferior court: (1) if its jurisdiction is special and limited and its judgments are valid only when its jurisdiction to render them appears therefrom, (2) if its jurisdiction is less extensive than that of another court over the same general subject matter, and (3) if its proceedings are subject to the supervision and control of another court.

When State ex rel. Knox v. Speakes, supra, was decided county courts were by the statute creating them completely under the supervision and control of the circuit court and therefore were inferior courts within the third of these tests. Consequently the court was not called on to apply either of the other two tests therefor. Under Sections 156 and 172 of the Constitution, the legislature may, but is not required to, place the courts created by it under the supervision and control of the circuit court unless Section 172 by implication does so require. This implication is said, in substance, to arise for the reason that under the English judicial system from which ours comes, all inferior courts were, under the common law, as it existed when our governments were formed, subject to the supervision and control of the court of the King's Bench, the jurisdiction of which our Constitution confers on the circuit court, from which it necessarily follows they should have supervision and

control over all inferior courts. As the common law is in force with us insofar as it is applicable to our habits and conditions, I freely admit that under the common law circuit courts have supervisory power over inferior courts, but the common law is not sacrosanct, either in its substantive or procedural aspects, but may be abrogated or modified at the pleasure of the legislature provided the Constitution is not violated by so doing. This is evidenced by most of the sections of the Code of 1930 and practically all of the circuit court's procedure, including its writ of certiorari, depends on or is regulated by sections appearing in that code. There is nothing in Section 172 which requires the legislature to give circuit courts supervisory power over inferior courts and Section 156 seems to proceed on the theory that it can exercise no such power by means of any appellate procedure unless authorized by law so to do, for it expressly provides that it shall have ''such appellate jurisdiction as shall be prescribed by law.'' Appellate jurisdiction may be exercised in three ways: (1) By writ of certiorari, (2) by writ of error, (3) by an appeal. Should the legislature fail to provide, or should abolish, any of these methods for the exercise by the circuit court of appellate jurisdiction, then no such jurisdiction can be exercised by it. From this it follows that inferiority of the legislative court to the circuit court may be determined by any one of the three tests hereinbefore set forth.

If it be said that if this appeal will lie, then the legislature may grant appeals direct to this court from the judgments of all inferior courts including courts of Justices of the Peace, and that the makers of the Constitution could not have so intended. The reply thereto is that no such result would here follow. Appeals to this court must be (1) from courts which exercise judicial and not merely quasi-judicial power, Illinois Cent. Railroad Company v. Dodd, 105 Miss. 23, 61 So. 743, 49 L. R. A. (N. S.), 565, and (2) whose procedure is such as

to permit this court to review and determine the correctness of its judgments without exercising original jurisdiction, i. e., trying the case on its merits on evidence heard by it. The procedure in courts of Justices of the Peace is such that an appeal from their judgments can only be made effective by a trial de novo in the appellate court, and this court has neither the power nor equipment therefor.

The narrow question here presented which is whether the legislature may constitutionally grant an appeal from a court created by it direct to the Supreme Court was answered in the affirmative ninety-eight years ago in Thomas v. State, 5 How. 20, and that case is controlling here unless it has been overruled expressly or by implication by a later case. Houston v. Royston, supra, and Ex Parte Tucker, 164 Miss. 20, 143 So. 700, only are necessary to be considered in determining whether this has been done.

The Constitution of 1832 contains a section which appears in our present Constitution as Section 172. In 1836 the legislature created a criminal court and gave to it criminal, but not civil, jurisdiction, conferred by the Constitution on the circuit court. Laws of 1836, page 25. No appeal or writ of error was allowed from the criminal court to the circuit court, but a writ of error was allowed the High Court of Errors and Appeals. Section 21 of the Statute provided: "That whenever it shall be made to appear to the satisfaction of the circuit court of any one of the counties embraced within the provisions of this act, that for any cause, injustice is likely to be done in any case depending in the court created by this act, in such county, the said circuit court shall award a certiorari to said criminal court, commanding such cause to be certified and sent into said circuit court, where it shall be proceeded on according to law."

Thomas, in Thomas v. State, supra, was convicted in the criminal court, and sued out a writ of error to the High Court of Errors and Appeals. One of his assign-

ments of error was, in substance, that the criminal court was without jurisdiction to try him, for the reason that it was not such an inferior court as the Constitution contemplated. One of the points made by his counsel in support of this assignment of error was that the criminal court must be inferior to the circuit court; consequently, an appeal or writ of error from its judgments must be to the circuit court. In counsel's language, ''The mere fact of its being limited in jurisdiction to a certain portion of the matters confided by the constitution to the circuit courts, does not per se render it inferior. If an appeal lay from the criminal court to the circuit court, then it is admitted that the former would be inferior to the latter, the power of revisal and correction being the true and just test of superiority. But such is not the case.'' In responding to this argument the court said: ''It [the statute creating the criminal court] makes it an inferior to the circuit court by conferring upon the latter the authority to bring the record of any prosecution pending in the former, before them by a writ of certiorari whenever it is made to appear that injustice is likely to be done in the criminal court, and the circuit court upon the removal of the record into it, is vested with full power to hear and determine the cause. The circuit courts are thus invested with full supervisory and controlling power over this court, and is thus superior to it, according to the rule insisted on by the counsel for the prisoners. But the criminal court is inferior in point of jurisdiction in another sense, and in the sense of the constitution, as we think. It is a tribunal of limited jurisdiction, its powers being confined exclusively to criminal proceedings. It has no civil jurisdiction, and is therefore inferior to the circuit courts.'' This could have meant, in the light of counsel's argument, only that the criminal court was inferior to the circuit court, although no appeal would lie from its judgment to the circuit court but only to the High Court of Errors and Appeals, thereby holding, by necessary implication, that an appeal from

a court inferior to the circuit court could lie direct to the High Court of Errors and Appeals.

The criminal court was obviously not an inferior court within the first of the tests hereinbefore set forth, consequently it was unnecessary for the High Court of Errors and Appeals to there discuss it. It is true that the court there further said: "It is not essential in order to sustain the authority of the legislature to create this court, to consider it inferior in relation to the circuit courts, or to any other court created by the constitution save that of the court of errors and appeals," but this in no way modified the holding that the criminal court was inferior to the circuit court in the constitutional sense.

The Constitution of 1832 created a Superior Court of Chancery with full jurisdiction of all matters of equity. In 1836 the legislature created a chancery court and conferred upon it equity jurisdiction, and appeals from its decrees were permitted to the Superior Court of Chancery and to the High Court of Errors and Appeals. A case decided by it was appealed to the High Court of Errors and Appeals, in Houston v. Royston, supra, and a motion was there made to strike it from the docket, for the reason that the court from which the appeal came was not such a court as the Constitution permitted the legislature to create, in that it was not inferior, in the constitutional sense, to the Superior Court of Chancery. In overruling this motion, the court receded from the holding, in Thomas v. State, supra, that the legislative court need only be inferior to the High Court of Errors and Appeals, and said it must be inferior to the court a part of the jurisdiction of which it exercises. In the course of its opinion, however, it said that the criminal court considered in Thomas v. State, supra, from which no appeal would lie to the circuit court, was inferior to the circuit court and, therefore, constitutionally valid. All that was there said about the necessity of the constitutional court having power to supervise the proceedings

in a legislative court exercising a part of its jurisdiction was in connection with the particular chancery court there under consideration. The necessity for the constitutional Superior Court of Chancery to have such supervision, it said, resulted from the fact that it was designated in the Constitution as ''The Superior Court of Chancery,'' from which it followed that such supervision was necessary. The validity of the statute creating the court, however, was upheld, although appeals from its decrees direct to the High Court of Errors and Appeals were permitted. This decision not only approved the holding in Thomas v. State that the criminal court there under consideration was inferior to the circuit court, although no appeal would lie therefrom to the circuit court but to the High Court of Errors and Appeals, but further upheld the validity of the statute creating the chancery court, an appeal from which would lie direct, as here, to the Supreme Court.

If some supervisory power in the circuit court over the proceedings of the county court here under consideration is necessary under the two cases I have been discussing, such power appears in the statute creating it to the same extent that the court said in Thomas v. State, supra, appeared in the statute creating the court it there had under consideration. This court, however, has never, since those two cases were decided, held a statute creating a court invalid, because the court, a part of the jurisdiction of which it exercises, was without supervisory power over it. On the contrary, it has upheld the validity of several statutes creating courts to which were given jurisdiction conferred on another court by the Constitution without giving the constitutional court any supervision over them. In Bell v. McKinney, 63 Miss. 187; Hughes v. State, 79 Miss. 77, 29 So. 786; Gober v. Phillips, 151 Miss. 255, 117 So. 600, statutes creating inferior courts and giving them jurisdiction, conferred by the constitution on the court of a justice of the peace, were approved, although no supervisory power over

them was conferred on the justice of the peace courts. The statute creating the present county courts held valid in State ex rel. Knox v. Speakes, supra, not only confers on them jurisdiction given by the Constitution to justices of the peace without giving those courts supervision over them, but also gives the county courts supervision over the justice of the peace courts by means of an appeal. Moreover, the county courts are given a part of the constitutional jurisdiction of the chancery court without any power in that court to supervise its proceedings.

This brings me to Ex Parte Tucker, 164 Miss. 20, 143 So. 700. The court there had under consideration the provision of Section 694, Code of 1930, which authorizes the transfer of felony cases from the circuit court to the county court. In the course of its opinion the Court said: "It is settled that as respects its constitutional validity all that is required of a court created by legislative act under the quoted constitutional section is that when a new court is created which shall exercise a part of the jurisdiction vested by the Constitution in another court, the said new court must be inferior in ultimate authority to the constitutional court whose jurisdiction is of the same character as that given to the new court. See State [ex rel. Knox] v. Speakes [supra]. It is competent, therefore, to create a court which may be permitted to exercise in full measure the same jurisdiction as the circuit court, so long as the circuit court shall be superior thereto and this attribute of superiority is accomplished by giving the circuit court the controlling authority of reversal, revisal, correction, and direction over the new court, as by certiorari, appeal, etc." This correctly sets forth one of the tests hereinbefore referred to by which to determine whether a court is an inferior court, i. e., whether its proceedings are subject to the supervision and control of another court. This test the county court met; consequently, it was unnecessary to resort to any other. That the court did not there mean to hold that supervision by means of an

appeal was necessary, was made clear when in concluding its opinion it said, ''Finally it is contended that there is no appeal to the circuit court from a conviction in the county court under a transferred indictment, and that for this reason the court should hold the provisions in respect to the transfer of indictments to be invalid. There is more than one answer to this contention, but it is sufficient to say that these transferred cases are appealable to the circuit court exactly as are other cases adjudged in the county court.'' Whether an appeal could lie from the county court to the Supreme Court was not there involved.

I concur in overruling the motion.

**Ethridge, J.**, delivered a dissenting opinion.

I am unable to agree with either the conclusions or the reasoning of my brethren in this case. In order that future generations may know the right, I shall state my views; for the right can never be fully known by human beings until, through reasoning and arguments, they are in possession of both sides of a controversy, and all the reasons that exist for a constitutional proposition. I do not propose to be shut out from consideration of policies and results in this case, for on constitutional questions there is a higher policy-making body than the legislature. I freely concede that when the Constitution is not violated, the legislature may declare the policy of the state. But when the Constitution is involved, the policy and purposes of the Constitutional Convention must be considered, and its policies given effect by the courts, although in so doing they have to strike down a legislative policy or purpose. The very purpose of a constitution is to limit and restrict all departments of the government, and especially the legislature. In such case the court is under the duty to give effect to the purposes and policies of the framers of the Constitution. We must consider here that the Convention was creating a

system of courts, and defining their jurisdiction, to prevent the legislature from doing violence to the administration of government. In deciding the question here involved we must view the whole framework of the Constitution, and give effect to its purposes. To begin with, the Convention was framing a Constitution which was to be a law for every officer in every department of the government, and for every citizen of the land, to secure the rights of citizens, and the enactment and administration of just laws, applying equally to all men. To begin with, it divided the powers of government into three separate, independent departments, confiding to each department a certain class of powers, and forbidding to each department the exercise of any power properly belonging to either of the others. This was not intended to be a mere rhetorical utterance, but to be an effective check upon the power confided to each department, and to create a system by which this purpose could be accomplished in fact, as well as in theory. The Constitution does not destroy power, but controls or limits it—takes power from the thunderbolt and puts it in the dynamo—takes it from the despot and puts it in the constitutional machine, to be regulated and used for the public good, rather than for private benefit.

The Constitution, in section 24, declared that the courts shall be open, and that every person who has suffered an injury to his person, property or reputation, shall have remedy in due course of law, without denial, sale or delay. This was an important purpose of the Constitution. It also declared that no citizen should be deprived of life, liberty or property except by due process of law. It named many other rights that could not be violated or infringed upon, except in a particular way pointed out in the Constitution itself. It declared that the property of citizens should not be taken for public use without just compensation first being made; and that the question as to whether the alleged purpose was a public one should be a judicial question, without regard to legisla-

tive declaration in regard thereto. These things were fundamental in the conception of the Constitutional Convention. It then came to the matter of establishing courts, and defining their jurisdiction in the Constitution—not leaving that to the legislature, as might have been done. It solemnly declared that all judicial power in this state should be vested in a supreme court and such other courts as are provided for in this Constitution. It created a Supreme Court, and provided for the judges and their terms of office, and safe-guarded their salaries from legislative or executive control. It gave to that Supreme Court such jurisdiction as properly belongs to a court of appeals, and no other. It then created the Circuit Court, providing that it should have jurisdiction over all cases, civil and criminal, of original nature, "not vested by this Constitution in some other court, and such appellate jurisdiction as shall be prescribed by law," (not the legislature).

It then created the chancery court, and prescribed its jurisdiction, giving it specific jurisdiction as set out in sections 159, 160 and 161 of the Constitution. It then created the board of supervisors, giving it full jurisdiction over roads, ferries and bridges, with such other duties as may be required by law. In this section it was provided that this jurisdiction should be exercised in accordance with such regulations as might be prescribed by the legislature.

In section 171 of the Constitution was created the office of justice of the peace, defining its jurisdiction as being over civil cases involving $200 or less, and over criminal misdemeanors, jurisdiction concurrent with the circuit court; providing that an appeal shall be allowed from justice of the peace courts, under rules and regulations to be prescribed by law.

It then gave the legislature power, and made it its duty, to establish, from time to time, such other inferior courts as may be necessary, "and to abolish the same whenever deemed expedient." Section 172. The words,

"other inferior courts" as used in this section, refer to justices of the peace and boards of supervisors, last named in the Constitution. In the former sections in regard to the Supreme Court and others, the word "inferior" was not used, which under the rules of construing the Constitution was an important matter, determining the character of the courts which the legislature may create under this section. The circuit court is a court of superior jurisdiction—in its upward reach it has no limit. Its only limit is as to petty matters of $200 or less in value, in its original jurisdiction; and as to other matters conferred on the chancery court in specific kinds of jurisdiction. The circuit court has original jurisdiction in all matters not specifically conferred upon the chancery court, or on justice of the peace courts, or boards of supervisors. It has supervisory jurisdiction of all kinds of inferior courts; this supervision is original jurisdiction; in the exercise of this supervisory jurisdiction all proceedings may be removed from the inferior court to the circuit court, by reason of its constitutional grant of power heretofore made.

A circuit court may forbid inferior courts from exercising any jurisdiction not given them by law. It may not only do this, but it may by mandamus and quo warranto compel officers to perform duties, or challenge their attempted use of powers not conferred by law. It may review the actions of the inferior courts by certiorari or writ of error, or some appropriate common law power by means of which supervision may be appropriately exercised. It may exercise the power of visitation, the method of control in restraining corporations, public or private, from exceeding their powers, and compel them to perform the duties imposed by law. It has jurisdiction over the life, liberty and property of citizens; for offences against the law it may try the offenders, and impose judgments authorized by law, even to the extent of taking life itself. If public offenders are guilty of crimes which disqualify them from holding

office, or a person is holding office who is not legally qualified to do so, the circuit court may entertain suits to bring such questions under review, and correct any improper action that either persons or corporations may assume to exercise. For offences by officers amounting to felonies or high misdemeanors in office, such officers may be indicted by grand jury, tried before a trial jury in the circuit court, and, if convicted, removed from office.

The jurisdiction of the circuit court extends to the rights, political as well as civil, of all persons. It is the great court of the people, mighty in power and authority; in no sense can it be called inferior to any court whatever. It is true that its judgments may be reviewed on appeal, to ascertain whether they conform to law and justice; and that a new trial may be granted in certain cases, under certain conditions provided by law; but the power of retrial is vested in the circuit court, and can be exercised by none other. It is the most powerful and influential authority, within the limits of its territorial jurisdiction, in the state, taxing the ingenuity of the most learned and able to discharge its functions. A judge of the circuit court holds a position of the highest honor and responsibility, calling for the highest degree of wisdom and ability, in order to fill the place successfully.

I call in question the statement of the majority opinion that appeals belong exclusively to the adjective or procedural side of the law, and is a subject with which the legislature has plenary power. This statement is true as applied to statutory courts, or to courts where there is no constitutional provision conferring jurisdiction, their jurisdiction being dependent on the grant of the legislature. In such cases appeals may be allowed or disallowed, at its discretion. But when appellate power is granted by constitution, there went with the grant, by implication, the power to do all acts necessary and proper to make its authority effective. In 2 Am. Jur., page 850, section 9, the concluding paragraph states: "A grant of appellate jurisdiction implies that there is in-

cluded in it the power necessary to exercise it effectively, to make all orders that will preserve the subject of the action, and to give effect to the final determination of the appeal. It carried with it, by implication, the power to protect that jurisdiction and to make the decisions of the court thereunder effective. The court, in aid of its appellate jurisdiction, has authority to control all auxiliary and incidental matters necessary to the efficient and proper exercise of that jurisdiction. For this purpose it may, when necessary, prohibit or restrain the performance of any act which might interfere with the proper exercise of its rightful jurisdiction in cases pending before it." See authorities cited in notes 2 and 3 to this text. "In construing the Constitution of the United States [it has been held by the Supreme Court] that what is implied is as much a part of the instrument as what is expressed." Re Yarbrough, 110 U. S. 651, 4 S. Ct. 152, 28 L. Ed. 274. In Rhode Island v. Massachusetts, 12 Pet. 657, 9 L. Ed. 1233, it was held that "some degree of application must be given to words, is a proposition of universal adoption; implication is but another term for meaning and intention, apparent in the writing on judicial inspection." It was also held in Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257, that a court, in construing a provision of the Constitution, may imply a negative from affirmative words, where implication promotes, but not where it negatives, the intention. McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, where the Court said, "If the end be legitimate, and within the scope of the constitution, all the means which are appropriate, which are plainly adapted to that end, and which are not prohibited, may constitutionally be employed to carry it into effect."

In Fairbanks v. United States, 181 U. S. 283, 21 S. Ct. 648, 45 L. Ed. 862, it was held that the true spirit of constitutional interpretation, both as to grants of power, and in respect to prohibitions and limitations, is to give full, liberal construction to the language, aiming ever to

show fidelity to the spirit and purpose. It was held in Cohen v. Virginia, supra, that the true spirit and meaning of the Federal Constitution will govern its construction, but must be apparent, to overrule words actually used therein.

The rules for construing constitutional provisions in the light of the common law are recognized in every state, and in the United States courts. This rule was felicitously stated by Chief Justice Taft in Ex Parte Grossman, 267 U. S. 87, 45 S. Ct. 332, 69 L. Ed. 527, 38 A. L. R. 131, as follows: "The language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions as they were when the instrument was framed and a-dopted. The statesmen and lawyers of the Convention who submitted it to the ratification of the Conventions of the thirteen states, were born and brought up in the atmosphere of the common law, and thought and spoke in its vocabulary. They were familiar with other forms of government, recent and ancient, and indicated in their discussions earnest study and consideration of many of them, but when they came to put their conclusions into the form of fundamental law in a compact draft, they expressed them in terms of the common law, confident that they could be shortly and easily understood." See, also, South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 50 L. Ed. 261; John Bad Elk v. United States, 177 U. S. 529, 20 S. Ct. 729, 44 L. Ed. 874; United States v. Wong Kim Ark, 169 U. S. 649, 18 S. Ct. 456, 42 L. Ed. 890; Schick v. United States, 195 U. S. 65, 24 S. Ct. 826, 49 L. Ed. 99, 1 Ann. Cas. 585.

In Minor v. Hapersett, 21 Wall. 162, 22 L. Ed. 627, it was held that constitutions must be construed with reference to the object to be attained. In the course of the opinion, 21 Wall. at page 172, at page 629 of the Law Edition, the Court said: "When the Constitution of the United States was adopted, all the several States, with the exception of Rhode Island, had Constitutions of

their own. Rhode Island continued to act under the charter from the Crown. Upon an examination of those Constitutions we find that in no State were all citizens permitted to vote. Each State determined for itself who should have that power. Thus, in New Hampshire, 'Every male inhabitant of each town and parish with town privileges, and places unincorporated in the State, of twenty-one years of age and upwards, excepting paupers and persons excused from paying taxes at their own request,' were its voters; in Massachusetts 'Every male inhabitant of twenty-one years of age and upwards, having a freehold estate within the Commonwealth of the annual income of three pounds, or any estate of the value of sixty pounds;' in Rhode Island 'Such as are admitted free of the company and society' of the Colony;'' and quoted on other provisions on suffrage. In the course of the opinion the Court said: ''The Constitution does not define the privileges and immunities of citizens. For that definition we must look elsewhere. In this case we need not determine what they are, but only whether suffrage is necessarily one of them. It certainly is nowhere made so in express terms. The United States has no voters in the States of its own creation. The elective officers of the United States are all elected directly or indirectly by state voters. The members of the House of Representatives are to be chosen by the people of the States, and the electors in each State must have the qualifications requisite for electors of the most numerous branch of the State Legislature. . . . It is not necessary to inquire whether this power of supervision thus given to Congress is sufficient to authorize any interference with the state laws prescribing the qualifications of voters, for no such interference has ever been attempted. The power of the State in this particular is certainly supreme until Congress acts. The Amendment did not add to the privileges and immunities of a citizen. It simply furnished an additional guaranty for the protection of such as he already had. No new

voters were necessarily made by it. Indirectly it may have had that effect, because it may have increased the number of citizens entitled to suffrage under the Constitution and laws of the States, but it operates for this purpose, if at all, through the States and the state laws, and not directly upon the citizen.''

In construing a constitutional provision its general scope and object should be considered. Groves v. Slaughter, 15 Pet. 449, 10 L. Ed. 800.

The objects for which a constitutional grant of power was given, especially when those objects were expressed in the instrument itself, have great influence in the construction of words, to the meaning of which there is serious doubt. Gibbons v. Ogden, 9 Wheat. 1, 188, 6 L. Ed. 23.

The safest rule in the interpretation of the Constitution is to look to the nature and objects of the particular powers, duties and rights, with all the lights and aids of contemporaneous history; and to give to each word just such force, consistent with its legitimate meaning, as may fairly secure and attain the ends proposed. Prigg v. Pennsylvania, 16 Pet. 539, 609, 10 L. Ed. 1060.

''The language of a constitutional amendment should be read in connection with the known condition of affairs out of which the occasion for its adoption may have arisen, and then construed, if there be therein any doubtful expressions, in a way, so far as is reasonably possible, to forward the known purpose or object for which the amendment was adopted.'' Maxwell v. Dow, 176 U. S. 581, 20 S. Ct. 448, 449, 494, 44 L. Ed. 597.

Many more authorities to the same effect could be cited, but it would only prolong this opinion unnecessarily. The Constitution of the state having conferred appellate power on the Supreme Court, and having provided for the judges of that court, their terms of office, and terms for the holding of court, etc., it intended for the Court to have and exercise such powers as properly belong to a court of appeals. It was not dependent upon

the legislature for the exercise of this power, but could exercise such power bestowed upon it—that is, to review final judgments of superior courts of original jurisdiction. It was not intended, and could not reasonably be so construed, in my opinion, to extend to appeals from all inferior courts. The meaning of a provision is to be determined by what may be done under it, and not merely what has been done under it. If the legislature should see proper to handicap this Court by granting appeals direct from all inferior courts it would effectively destroy the ability of the Court to function as the Constitution intended.

There are at least five justices of the peace in each county of the state—and actually many more, under authority to create additional justices. There are 82 counties in the state. The justice courts may sit in civil cases twice a month, and in criminal cases at any convenient time. Should appeals be granted from those courts direct to this Court, it would be impossible for the latter to function.

There are 82 boards of supervisors in the state, which hold sessions monthly, with power to order special terms. Should the legislature grant appeals direct from that court to this Court, it would also destroy the power of the Court to properly function. There are many other inferior courts, such as police courts in cities, which hold many terms, sometimes daily. Is it a possible construction to hold that the legislature could grant appeals from all these courts to the Supreme Court of the state? The object and purpose of the Constitutional Convention was to have the Supreme Court only review the judgments of superior courts, to the end that there might be uniform construction of the law throughout the state. There are seventeen circuit court districts in the state, and eleven chancery court districts. The Supreme Court might have twenty-eight different constructions of a statute, or of any other legal question; for this reason, and to the end that the decisions might be uniform, the Supreme Court was given appellate jurisdiction only.

In most of the states the Supreme Court is a court of final appeals, and is given jurisdiction of the great prerogative writs; but where that is not true these writs belong to part of the original jurisdiction of the common law courts of highest original jurisdiction. 14 Am. Jur. 464, sec. 269.

The Constitution intended to make the three departments of the government effective, and so arranged that neither of the other departments could destroy or effectively impede any other department in its proper functioning. To this end, and with this in view, the Constitutional Convention created a system of courts, and defined their respective jurisdictions and powers in general terms, so that in a period of hostility to the courts, should there every exist such a period, its functioning and administration would not be hindered or unduly abridged. It was to be an independent· department, having power to function in and of itself. Suppose that the legislature should decide to enact that where a statute's constitutionality was challenged, and the statute sustained by the trial court, no appeal should be allowed;—would such statute be constitutional? Manifestly not.

It has been thoroughly settled that the Supreme Court has original jurisdiction by constitution—and no other; and that the legislature cannot confer original jurisdiction on the Supreme Court; that the Constitution in such case is exclusive. Planter's Ins. Co. v. Cramer, 47 Miss. 200; Brown v. Carraway, 47 Miss. 668; Peirce. v. Halsell, 90 Miss. 171, 43 So. 83; Berry v. Brown, 109 Miss. 64, 67 So. 662; Brown v. Sutton, 158 Miss. 78, 121 So. 835; Moore v. White, 161 Miss. 390, 137 So. 99; McKee v. Hogan, 145 Miss. 767, 111 So. 357; Wynn et al. v. I. C. R. Co., 108 Miss. 376, 66 So. 410; and Wynn v. I. C. R. Co., 105 Miss. 786, 787, 66 So. 410, in which last two cases it was held that the Supreme Court could not issue and try the prerogative writs, prohibition, certiorari, quo warranto and mandamus.

The Circuit Court has, by virtue of its common law jurisdiction, which is carried forward into the constitutional grant, the power to issue certiorari independently of statute, to review the proceedings of an inferior court, as was held in the case of Holberg v. Macon, 55 Miss. 112. In the syllabus of that case it was held that, "The Circuit Court has, by the common law, jurisdiction upon certiorari to examine and reverse judicial proceedings had before the mayor of a municipal corporation, although there be no statute providing for a certiorari in such case." In the course of the opinion, the Court said: "The appeal taken from the Mayor's Court was dismissed in the Circuit Court, upon the ground that the latter tribunal had no jurisdiction by law to entertain appeals from the former. Whether this be true or not, the Circuit Court has, by the common law, jurisdiction by certiorari to revise the proceedings of inferior tribunals, and it is agreed by the parties that the proceedings here shall be treated as by certiorari. Says Judge Dillon, in his work on Municipal Corporations: 'The unquestionable weight of authority in this country is, if an appeal be not given, or some specific mode of relief provided, that the superior common-law courts will, on certiorari, examine the proceedings of municipal corporations, even though there be no statute giving this remedy; and if it be found that they have exceeded their chartered powers, or have not pursued those powers, or have not conformed to the requirements of the charter or law under which they have undertaken to act, such proceedings will be reversed or annulled. An aggrieved party is, in such case, entitled to a certiorari, ex debito justitiae.' 2 Dill. on Mun. Corp., sec. 740, and authorities there cited." See, also 9 Century Dictionary, title "Certiorari," sections 20 to 48.

It appears from Planters' Ins. Co. v. Cramer, supra, that the circuit court has the power of the common law courts of England prior to the Revolution, the courts of common plea and the courts of King's Bench, as de-

fined in Cooley's Blackstone, page 885, as being so called because "the king used to sit there in person, the style of the court still being Coram ipse Rege." This court is "the supreme court of common law in the kingdom, consisting of a chief justice and three puisne (younger) justices, who are by their office the sovereign conservators of the peace, and supreme coroners of the land. Yet though the king himself used to sit in this court, and still is supposed so to do, he did not, neither by law is he empowered to, determine any cause or motion but by the mouth of his judges, to whom he has committed his whole judicial authority. . . . The jurisdiction of this court is very high and transcendant. It keeps all inferior jurisdictions within the bounds of their authority, and may either remove their proceedings to be determined here, or prohibit their progress below. It superintends all civil corporations in the kingdom. It commands magistrates and others to do what their duty requires, in every case where there is no other specific remedy. It protects the liberty of the subject by speedy and summary interposition. It takes cognizance both of criminal and civil causes, the former in what is called the crown-side or crown-office, the latter in the plea-side of the court. The jurisdiction of the crown-side, it is not our present business to consider, that will be more properly discussed in the ensuing book. But on the plea-side, or civil branch, it hath an original jurisdiction and cognizance of all actions or trespass, or other injury alleged to be committed vi et armis or actions of forgery of deeds, maintenance, conspiracy, deceit and actions on the case which allege any falsity or fraud, all of which savor of a criminal nature, although the action is brought for a civil remedy, and make the defendant liable in strictness to pay a fine to the king, as well as damages to the injured party."

Blackstone further discusses the question, and then says that the court of appellate jurisdiction is, "likewise a court of appeal into which may be removed, by a

writ of error, all determinations of the court of common pleas, and of all inferior courts of record in England, and to which a writ of error lies also from the court of King's Bench in Ireland? Yet even this so high and honorable court is not the dernier resort (last resort) of the subject; for, if he be not satisfied with any determination here, he may remove it by writ of error into the house of lords, or the court of exchequer chamber, as the case may happen, according to the nature of the suit, and the manner in which it has been prosecuted." 11 Am. Jur. 672 and notes 18 seq., Sinclair v. State, 161 Miss. 142, 132 So. 581, 74 A. L. R. 241; Ratliff v. Beale, 74 Miss. 247, 20 So. 865, 34 L. R. A. 472.

It will be seen that this court of the King's Bench has the power to review cases from inferior courts, and to prohibit inferior courts from taking action in judicial causes beyond its jurisdiction. By section 156 of the Mississippi Constitution, the Circuit Court has jurisdiction belonging to the court of the King's Bench, and all other common law courts, and may remove causes from the inferior courts to the circuit court for review.

In the case of Bell v. City of West Point, 51 Miss. 262, the Court had occasion, in 1875, to consider and discuss the jurisdiction of the circuit court, and courts of justices of the peace, under the Constitution as it then existed; and it held that the circuit court had by constitutional grant all jurisdiction of the King's Bench and other common law courts of England. In the course of its opinion it said: "It will be profitable in this discussion to fix in the mind a clear conception of the plan of organizing the judicial power in the constitution. For reading the language of that instrument on this subject, we must have reference to that system of jurisprudence, and the constitution of its tribunals, from which ours has been derived. We find in Great Britain that there were certain superior courts, of original common law jurisdiction; a court of chancery, with cognizance in all matters of equity, and certain inferior courts, with cog-

nizance of petty suits. The people of this country, who inherited the common law, have always been accustomed to the administration of justice in tribunals, constituted in the main, on the model of these prototypes. We have always had in territorial times, and after the organization of the state in 1817, under each of the three constitutions, a circuit court of original common law jurisdiction, civil and criminal, which stood in the place of, and represented the judicial power of the three great courts of Westminster Hall. [Citing authorities.] . . . In organizing the judicial department, the history and sentiments of the country would logically point out a system founded on the plan which I have sketched. From these general observations I pass to a general examination of the words used in the constitution to arrange and distribute the judicial power. They should not be interpreted in a narrow sense, but be so read as to give full and complete effect to the plan, and so as to give harmony, and the avoidance of conflict between the several courts. . . . 'The circuit court shall have original jurisdiction in all matters, civil and criminal, in this state.' Dwelling a moment on the language, it is broad enough to embrace suits at common law as well as in equity—'all matters civil.' But we know that the purpose was to create a court of common law cognizance, and we, therefore, give that import only to the words. That is plain, from the history of the past as well as from the subsequent sections of the same article. . . . The circuit courts and the chancery court were designed to administer justice according to their respective modes of procedure in all the more important suits. The justices of the peace were intended to have a restricted and subordinate jurisdiction, limited by the amount in controversy.''

At page 271, at the bottom, the Court said: ''When, therefore, the legislature has selected the subjects, within the maximum of value, then all other common law jurisdiction in civil matters pertains to the circuit court.

The constitution intends the legislature shall consult the convenience and necessities of the people in apportioning the jurisdiction of the justice of the peace. 'Causes' is a broad term, and includes as well suits for a chattel, for a tort, as for a debt. The reason is just as urgent, that the magistrate of the neighborhood should decide a controversy about the ownership of a hoe, a rake or a pig, as about a debt. . . . In determining whether the circuit court has cognizance of a particular suit we must bear in mind that it is a superior court of original jurisdiction over all civil matters, and the inquiry is, has the particular subject been excluded and cognizance been bestowed on some other court? When we consider the authority conferred on the justice of the peace, we must remember that, from the earliest organization of the territorial government he has had a narrow civil authority conferred by the statute, and, with this fact before us, read the 23d section. We find the section to be a literal transcript from its original in the constitution of 1832, except that the jurisdiction may be increased in amount.''

From the entire opinion we see that the circuit court has all the power of the ancient common law courts of England, including the King's Bench, common pleas, and other courts inferior to these. In Houston v. Royston, 7 How. 543, the Court had occasion to discuss fully the power of the superior courts to control or supervise the action of the inferior courts created by the legislature under a constitutional provision, like section 172. The opinion in this case was written by that eminent jurist, Judge Sharkey, a spark of whose genius could penetrate the densest legal sophistries, and who had the judicial courage to take the sword of common sense and cut the Gordian knot of technicalities, wherever technicalities prevented the fair and just administration of the law. He called attention to the fact that the judicial power of the state was by the constitution vested in one High Court of Errors and Appeals, and such other courts of

law and equity as were thereinafter provided for in the Constitution; and that such provision of the Constitution vested all judicial power in the constitutional court, saying: ''In the outset it is apparent that the convention intended to parcel out to the respective courts created by the constitution the entire judicial jurisdiction which might pertain to a state or government. None was left undisposed of.''

He then referred to the provision that the legislature might, from time to time, establish such other inferior courts as might be deemed necessary, and abolish the same whenever they should deem it expedient; and said: ''Such a provision indicates that the convention thought that it might be convenient and proper to make some changes in the judicial system. Nothing else could have induced such a provision. And it must have been the design to clothe the legislature with power to make such changes. Such a provision was not inserted to give the legislature power to provide for the exercise of a jurisdiction which had not been disposed of, for it was all appropriately vested by the constitution; none remained for legislative disposition. The power therefore to create inferior courts, necessarily implies the power to clothe them when created with a part of the jurisdiction which had been vested in the courts established by the constitution; otherwise they could have no jurisdiction whatever, for the constitution had disposed of all. . . . What is meant by an inferior court, in the sense in which that term is used in the 24th section? The article alluded to enumerates all the courts of the state, beginning with the High Court of Errors and Appeals, and ending with the courts of justices of the peace. Now does the article mean by inferior courts, such courts only as are inferior or below all of those mentioned, even down to a justice's court? I do not so understand it; but I understand it to mean that when the legislature created a court and gave it jurisdiction, that it must be inferior to the court created by the Constitution,

whose jurisdiction was of the same character as that given to the new court by the legislature. Thus, if the legislature wished to create a court which should exercise a part of the jurisdiction now exercised by the circuit courts, they could only do so by creating a court inferior to the circuit court.''

The act of the legislature there involved was the creation of a vice-chancery court, being the act of February 26, 1842, Hutchinson's Code, page 775, which created an inferior chancery court and vice-chancellor, and provided for causes to be placed in the inferior chancery court jurisdiction, fixed time and place for holding of the court terms, and gave to such court concurrent power and jurisdiction within the district with the superior court of chancery.

It was provided in section 9 of the act, page 777 of Hutchinson's Code, that it should be lawful in the district chancery court for the defendant ''to remove any cause therein pending against such defendant or defendants, or any original proceeding, to the superior court of chancery, on proving to the satisfaction of the vice-chancellor in term time, by affidavit, that said defendant or defendants, if there be more than one of them, reside and have a freehold all of them without the said district, and within the limits of this state;'' and providing the time within which such application should be made.

Section 16 of the act reads: ''From any order or decree of the said district chancery courts an appeal may be taken in the manner now prescribed for appeals from the superior court of chancery; but such appeals shall be taken from the said district chancery courts to the superior court of chancery, but such appeals shall be taken from said district chancery court to the superior court of chancery unless by consent of both parties, when the same may be taken directly to the High Court of Errors and Appeals; and either party who may be aggrieved by any order or decree of the said district chancery court, may sue out a writ of error to

the High Court of Errors and Appeals; and appeals or writs of error so taken or sued out, shall be proceeded in by the High Court of Errors and Appeals, as in like cases from the said superior court of chancery.''

The attack upon the act was not made with reference to a writ of error, but to the constitutionality of the court. The act creating the inferior court of chancery made an appeal from a decision from that court to the High Court of Errors and Appeals dependent upon the consent of both parties—the appeal, unless consented to, went to the superior court of chancery. Therefore, the jurisdiction of the superior court of chancery over the inferior court of chancery was given, preserving the right of the superior court of chancery to finally decide the controversy upon all questions of law and fact. The court held that in order to be constitutional the inferior court must be subject to the supervision of the superior court whose jurisdiction it was exercising. It is plain that under that act the constitutionality of the law depended upon the preservation of the right of the superior court to control the inferior court. But the Court did not point out, or discuss, how an appeal to the superior court of chancery, and a writ of error to the High Court of Errors and Appeals, could both exist. That question was not there presented, as it should have been; and consequently the opinion does not deal with that, and is not authority for the proposition that an appeal can be granted directly from an inferior court, created under section 172 of the Constitution, to the Supreme Court.

Can the supervisory power, constitutionally vested in the circuit court, be taken away from it by the legislature? How can the statute granting an appeal from the county court to the supreme court directly co-exist with the constitutional right of the circuit court to bring the records and controversies from the county court to the circuit court? Manifestly both powers cannot exist at the same time. Suppose that one party desires a certiorari to the circuit court, to review the controversy on

the questions appearing on the record, and the other party desires to carry the cause to the Supreme Court, to review questions which he desires to have considered. Which court could act efficiently and bindingly in such a state of affairs? Suppose that two persons are jointly indicted and tried for a felony in the county court, each dissatisfied with the decision, and desiring it to be reviewed; one wishes to go to the circuit court, the other to the Supreme Court. Under such circumstances, can the circuit court exercise its jurisdiction, recognized by the Constitution, while the other is on appeal to the Supreme Court? If not, then the legislature has taken from the circuit court a part of its constitutional jurisdiction—which the legislature may not do, under the decisions in Montross v. State, 61 Miss. 429; State ex rel. Salter v. Board of Supervisors, 111 Miss. 867, 72 So. 700; Havens v. Hewes et al., 128 Miss. 650, 91 So. 397; Jefferson County Board of Supervisors v. Arrighi, 54 Miss. 668; Seal v. Donnelly, 60 Miss. 658. If it may not do so, then the provision of the act here involved is unconstitutional. It is true that the power of control over inferior tribunals is separate from, and independent of, their appellate jurisdiction. Still, the two powers cannot be exercised at the same time because when the certiorari issues from the circuit court the record is removed from the county court; and when the appeal is taken from the county court, if valid, to the Supreme Court, the record is removed to this Court; and both courts cannot at the same time exercise their respective powers. The question as to which court exercises supervisory control over a particular tribunal, and which tribunals are subject to the control of the superior courts, depends to a considerable extent on the form of organization of the judiciary in the particular jurisdiction. The power, if it exists, is usually possessed by the highest court of the state. But a similar power is also frequently possessed by intermediate courts with appellate jurisdiction. The question whether a particular body was an inferior court or

tribunal so as to be subject to the power has been raised in a number of cases. The words "inferior courts," in constitutional provisions granting a particular court superintending control over "inferior courts," have generally been regarded as indicating the "relative rank and authority" of courts. 14 Am. Jur. 463, section 268.

"Generally speaking the inherent power of 'general superintendency' has its seat in the highest law courts of original jurisdiction. While in some of the states a power akin to it is used by the ultimate courts of appeal, and by the United States courts in aid of their appellate jurisdiction, yet the transmitted power of the King's Bench, pure, comprehensive, and simple, may be said to be lodged in the courts first mentioned." 14 Am. Jur. page 464, and case notes 19 and 20.

It will appear from case notes in 112 A. L. R., page 1352, et seq., that the constitutions of many of the states have vested in their supreme courts or highest courts of appeal the superintending powers of all other courts. But in this state the superintending power is not vested in the Supreme Court by the Constitution, but inheres in the circuit court. In a case note in 112 A. L. R. 1352, it is said: "The superintending control over inferior tribunals possessed by courts in various states in this country 'is of ancient inception, and relates back to and has its origin in the power exercised by the King's Bench in England;'" citing authorities. And at page 1356 it is said: "The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practially hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur, it will be found able to cope with them. And, if required, the tribunals having authority to exercise it will, by virtue of it, possess the power to in-

vent, frame and formulate new and additional means, writs and processes whereby it may be exerted.''

If the circuit court has the power, under the Constitution, without statutory aid, to supervise and control all inferior courts, the statutes in existence recognize this power, and make it effective by sections 72 and 73, Code of 1930. And under these sections the writ of certiorari may be availed of, although the statute grants an appeal. If the court on the proceedings appearing on the face of the record finds error, it may reverse and retry the case, and the record may be made in the inferior court, embracing the rulings of the court on every question of law involved in the trial. For instance, in the county court the instructions given to the jury by the court, when marked filed and given, or filed and refused, by the court and clerk, become a part of the record. And likewise any other ruling may be made a part of the record in the same manner.

After the county court act was passed by the legislature, the constitutionality of the act was tested in the suit of State ex rel. Knox v. Speakes, 144 Miss. 125, 109 So. 129, in which the constitutionality of the act was sustained, because at that time the appeals from the county courts on all questions were to the circuit court; and there was no question of the power of the circuit court, on appeal, to review and control the case. In the course of the opinion there the Court said, in the majority opinion: ''The Legislature can do no more than give it a concurrent jurisdiction, for it cannot divest jurisdiction already vested, and the superior court of chancery has 'full jurisdiction in all matters of equity,' '' quoting from Houston v. Royston, supra. Two of the Judges dissented in that case, for the reason that the county court act gave the county court jurisdiction of equity matters up to $1,000; and relied upon Houston v. Royston to sustain that position. The court below had held the act unconstitutional, and the Court was divided upon the question of its constitutionality. But my vote

on that question was controlled by the concluding part of section 156 of the Constitution, which provides for such appellate jurisdiction as shall be prescribed by law, which I thought was a constitutional grant of authority to the legislature to grant to an inferior court equity jurisdiction, reviewable by appeal or certiorari by the circuit court. This last clause was not in the Constitution when the case of Houston v. Royston was decided, and consequently it broadened the power of the legislature to deal with inferior courts by giving appeal jurisdiction to the circuit court, with no restrictions on the character of appeals, or from what court. Had I voted the other way the county court act would have been declared unconstitutional. Had I foreseen what would subsequently happen, or if the matters concerning appeals had then been as the last statute sets forth, I would not have sustained the constitutionality of the appellate provision as to county courts, and consequently the act would have been declared unconstitutional, as above stated.

Judge Anderson's opinion cites, and relies upon, Thomas v. State, 5 How. 20, involving the county court act passed in 1836, shortly after the passage of the Constitution of 1832; but the act there involved was attacked on the ground that the creation of the court was unconstitutional, and did not involve the constitutionality of the appeal feature of the act alone. The attack was made on the county court, and the case was carried to the High Court of Errors and Appeals on a writ of error. The act there involved was in regard to a criminal court, having power to empanel grand juries, and try criminal cases, in several counties in the state, and was passed and approved in 1836. One of the sections of the act gave the circuit court power, by writ of certiorari, to review all the proceedings in the criminal court. Another section provided that all the provisions with reference to bills of exception and writs of error allowed in the circuit court should be allowed in that court; but did

not specify that the appeal was to the High Court of Errors and Appeals. However, the writ of error was carried to the latter court, and no question was raised as to the constitutionality of the appeal section per se. The Court pointed out in its opinion that the circuit court had power of supervision by reason of the act itself, and was not deprived of that jurisdiction; but it did not discuss how that power in the circuit court could be exercised, if the case was removed to the High Court of Errors and Appeals.

In other words, the question here presented was not presented in the above case, and consequently it is not authority here. Furthermore, the subsequent case of Houston v. Royston, supra, cleared up what was, and what was not, an inferior court.

Subsequent to the upholding of the constitutionality of the act creating the county courts, as it was originally passed, the legislature passed an act authorizing the circuit court, in felony cases less than capital, to transfer such cases to the county court for trial, and the constitutionality of that act was challenged; but the appeal at that time was direct to the circuit court from the county court, and the constitutionality of the act was upheld against the attack there made, on the ground that the circuit court had not been deprived of its jurisdiction, and had not parted, through such transfer, with the ultimate control of the decision in the case. In concluding the opinion upon that subject the Court said: "Finally it is contended that there is no appeal to the circuit court from a conviction in the county court under a transferred indictment, and that for this reason the court should hold the provisions in respect to the transfer of indictments to be invalid. There is more than one answer to this contention, but it is sufficient to say that these transferred cases are appealable to the circuit court exactly as are other cases adjudged in the county court.'' The Court also said in that opinion: ''It would not be competent for the Legislature to enact in

a mandatory manner that all or any particular classes of the indictments shall be transferred, for this would be to that extent to strip the circuit court of its constitutional original jurisdiction, Myers v. People, 67 Ill. 503; from which it follows that the one and only constitutional method of effectuating the transfer is for the Legislature to provide what class or classes of indictments may be transferred, and to provide that within the limitations so prescribed the discretion so to order shall be vested in the circuit court, and that exactly is what the quoted section, 694, Code 1930, does.''

Courts are created for the benefit of the people, and where a court is vested with jurisdiction by the Constitution, it cannot, without constitutional sanction, divest itself of this jurisdiction to an inferior court, or to any other court, so as finally to divest it of its power to deal with the subject in a final manner. The act there involved would not have been upheld, had not the right of appeal, or some other method of final review, been given, enabling the circuit court to review the action of the inferior court. The Constitution does not provide for any transfer from the circuit court of jurisdiction properly vested in it. But the section authorizing the circuit court to make any transfer at all is in regard to transfers to the chancery court of suits brought in the circuit court, but which should have been brought in the chancery court. Prior to 1890 this power did not exist, and if a suit was brought in the circuit court of which the chancery court was exclusively cognizant, the only course was to dismiss the suit—it could not be transferred. This was repeatedly announced. It was never contemplated that the circuit court could divest itself of the jurisdiction properly conferred upon it by the Constitution, or of one necessary for the full and complete exercise of its constitutional jurisdiction. See Cain v. Simpson, 53 Miss. 521; Grenada Grocery Co. v. Tatum, 113 Miss. 388, 74 So. 286.

I am therefore of the opinion that the motion to transfer the cause to the circuit court, where it properly belongs, should be sustained.